101 Cal.Rptr.2d 470 (2000)
24 Cal.4th 468
12 P.3d 720
GERAWAN FARMING, INC., Plaintiff and Appellant,
v.
William J. LYONS, Jr., as Secretary, etc., et al., Defendants and Respondents.
No. S080610.
Supreme Court of California.
November 27, 2000.
*474 Brian C. Leighton, Clovis; Mayer, Brown & Platt, Michael W. McConnell, Chicago, IL., and Sharon Swingle, Washington, Dist. of Columbia, for Plaintiff and Appellant.
Donald Lescoulie, Fresno, and James A. Moody, Washington, Dist. of Columbia, for Matsui Nursery, Inc., Delano Farms, Inc., the Susan Neill Company, Country Eggs, Inc., Rosemary Farms, Inc., Duarte Nursery, Inc., Bidart Bros., Inc., and Britton-Konynenburg Partners as Amici Curiae on behalf of Plaintiff and Appellant.
Law Offices of Manuel S. Klausner, Los Angeles, Manuel Klausner and Erik S. Jaffe, Washington, Dist. of Columbia, for the Center for Individual Freedom as Amicus Curiae on behalf of Plaintiff and Appellant.
Thomas E. Campagne & Associates and Jeffrey C. Heeren, Fresno, for Wileman Bros. & Elliott, Inc., as Amicus Curiae on behalf of Plaintiff and Appellant.
Daniel J. Popeo, R. Shawn Gunnarson; Cadwalader, Wickersham & Taft, Steven G. Brody, New York, NY, Christine P. Jackson; and Susan Liebeler for Washington Legal Foundation as Amicus Curiae on behalf of Plaintiff and Appellant.
Bill Lockyer, Attorney General, Roderick E. Walston and Richard Frank, Chief Assistant Attorneys General, Charles W. Getz IV and Mary E. Hackenbracht, Assistant Attorneys General, Richard M. Thaihammer, Ellen M. Peter, Edna Walz and Tracy L. Winsor, Deputy Attorneys General, for Defendants and Respondents.
*475 Jennifer Friesen; Dowling, Aaron & Keeler, Dale Ikeda and Philip D. Kopp, Fresno, for the California Asparagus Commission, California Cut Flower Commission, California Pepper Commission and the California Tomato Commission as Amici Curiae on behalf of Defendants and Respondents.
Baker, Manock & Jensen, Kendall L. Manock, Robert D. Wilkinson, Linda B. Othman, Fresno, and John A. Bezmalinovic for the California Table Grape Commission and the California Stone Fruit Coalition as Amici Curiae on behalf of Defendants and Respondents.
Kahn, Soares & Conway, George H. Soares, Dale A. Stern, Sacramento, and Robert S. Hedrick for the California Apple Commission, California Avocado Commission, California Date Commission, California Egg Commission, California Forest Products Commission, California Grape Rootstock Improvement Commission, California Kiwifruit Commission, California Pistachio Commission, California Rice Commission, California Strawberry Commission, California Walnut Commission and Lodi-Woodbridge Winegrape Commission as Amici Curiae on behalf of Defendants and Respondents.
Jonathan P. Hiatt, James B. Coppress; Altshuler, Berzon, Nussbaum, Berzon & Rubin and Scott A. Kronland, San Francisco, for the American Federation of Labor and Congress of Industrial Organizations as Amici Curiae on behalf of Defendants and Respondents.
Manatt, Phelps & Phillips, Catherine A. Conway and Vincent M. Waldman, Los Angeles, for Sun-Maid Growers of California as Amicus Curiae on behalf of Defendants and Respondents.
Marie M. Moffat, Lawrence C. Yee, Dina E. Goldman, San Francisco; Howard, Rice, Nemerovski, Canady, Falk & Rabkin, Steven L. Mayer, Todd E. Thompson and Margaret W. Rosequist, San Francisco, for the State Bar of California as Amicus Curiae on behalf of Defendants and Respondents.
MOSK, J.
The First Amendment to the Constitution of the United States, one of the provisions of the Bill of Rights, states: "Congress shall make no law ... abridging the freedom of speech, or of the press ...." (U.S. Const., 1st Amend.)
Article I of the Constitution of the State of California, entitled the Declaration of Rights, states in subdivision (a) of section 2: "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press."
In Glickman v. Wileman Brothers & Elliott, Inc. (1997) 521 U.S. 457, 117 S.Ct. 2130, 138 L.Ed.2d 585 (hereafter sometimes Glickman ), a case of first impression, the United States Supreme Court, by a bare five-to-four majority, concluded that a marketing order issued by the Secretary of Agriculture of the United States did not implicate any right to freedom of speech under the First Amendment by compelling funding of generic advertisingthat is, advertising for a commodity as such, without reference to brand, etc.
In this cause, itself a case of first impression, we consider whether a marketing order issued by the Secretary of Food and Agriculture of the State of California implicates any right to freedom of speech under either the First Amendment or article I by compelling funding of generic advertising.
As we shall explain, we conclude that the marketing order in question does not implicate any right to freedom of speech under the First Amendment, but does indeed implicate such a right under article I.

I
The background to this actionhistorical, statutory, and administrativeis as follows.

*476 A
In the course of the Great Depression, Congress enacted the Agricultural Marketing Agreement Act of 1937 or the AMAA. (See generally Act of June 3, 1937, ch. 296, 50 Stat. 246 et seq., as amended, codified at 7 U.S.C. § 601 et seq.)
The AMAA declared, as one of Congress's policies, the establishing and maintaining of orderly marketing conditions for agricultural commodities in order to raise and support prices for their producers.
To effectuate this policy, the AMAA authorized the Secretary of Agriculture of the United States to enter into "marketing agreements," which are contract-like arrangements with the producers and handlers of agricultural commodities concerning marketing matters, and provided that the making of any such agreement should not be held violative of any federal antitrust law.
To the same end, the AMAA also authorized the Secretary of Agriculture to issue "marketing orders," which are regulations governing marketing matters for the producers and handlers of agricultural commodities. It provided for participation in the administration of such orders by the regulated producers and handlers themselves. It substantially restricted the terms of such orders generally to the limitation on total quantity marketed, the allotment of amounts for purchase, the allotment of amounts for marketing, the determination of the existence and extent of any surplus, the establishment of reserve pools, and, impliedly, the institution of grading and standards and the conduct of research. It also mandated that the regulated producers and handlers had to contribute funds to cover related expenses. It authorized the secretary to terminate as well as issue such orders. It generally provided that no such order could become effective unless approved or favored, as specified therein, by the regulated producers. Similarly, it generally provided that no such order could remain effective unless favored, as specified therein, by the regulated producers. It authorized the secretary to conduct referenda, expressly with regard to the coming into effect of such an order and impliedly with regard to its remaining in effect. In light of features of this sort, the mechanism of regulation that such an order sets up is, essentially, one of "self-regulation" by the regulated producers and handlers. (H.R.Rep. No. 99-271, 1st Sess., pt. 1, pp. 195-196 (1985), reprinted in 1985 U.S.Code Cong. & Admin.News, p. 1299.)
Since 1937, Congress has amended the AMAA on several occasions. As a general matter, the AMAA has retained the core of the provisions described above, but has expanded beyond their periphery. Notably, although it continues to restrict the terms of marketing orders for agricultural commodities that it authorizes the Secretary of Agriculture to impose, it now permits more than it did originally. Specifically, it today allows, among other terms, the undertaking of research and development projects, encompassing, for plums and 25 other specified commodities,[1] "any form of marketing promotion including paid advertising," "the expense of which is "to be paid from funds collected pursuant to the marketing order" in question. (7 U.S.C. § 608c(6)(I).) It first allowed a term of this sort, albeit not extending to advertising, in 1954. It first allowed one extending to advertising for a single specified commodity in 1962. It then did the same for 14 specified commodities, including plums, in 1965. It did likewise for the remaining 11 specified commodities, one or *477 more at a time, in 1970, 1971, 1978, 1980, 1983, 1988, and 1999. From all that appears, and plainly with respect to plums (see H.R.Rep. No. 89-846, 1st Sess., pp. 2-4 (1965), reprinted in 1965 U.S.Code Cong. & Admin. News, pp. 4143-4144), it has allowed terms extending to advertising in order to satisfy requests made by, among others, the regulated producers themselves.
Marketing Order No. 917 (see generally 7 C.F.R. § 917 (2000)), entitled the California Tree Fruit Agreement, was issued by the Secretary of Agriculture pursuant to the AMAA in various years in its various subparts, deriving ultimately from Marketing Order No. 36, issued in 1939. It presently applies to pears and peaches, and formerly applied to plums as well. It provides for the establishment of a "Control Committee," whose members are drawn, largely if not exclusively, from the regulated producers and handlers themselves. It provides too for a "Commodity Committee" for each of the fruits, which is effectively filled with or controlled by the regulated producers themselves. In addition, and among other things, it provides for the Control Committee's administration of its terms. It also provides for each Commodity Committee's undertaking of research and development projects, encompassing "any form of marketing promotion including paid advertising," "the expenses of which "shall be paid from funds collected pursuant to" assessments imposed on the regulated handlers by the secretary, on the committee's recommendation. (7 C.F.R. § 917.39 (2000) [presently, for pears and peaches]; 7 C.F.R. former § 917.39 (1991) [formerly, for plums as well]; see 7 C.F.R. § 917.37 (2000) [presently, for pears and peaches]; 7 C.F.R. former § 917.37 (1991) [formerly, for plums as well].) It has so provided for pears and peaches since 1976. It had done the same for plums since 1971. It sets out specific regulations regarding both fruit containers and packs.
Marketing Order No. 917 was terminated by the Secretary of Agriculture in 1991 as to plums because the results of a referendum conducted that year "demonstrated a lack of producer support ...." (56 Fed. Reg. 23773 (May 24, 1991).)

B
Also in the course of the Great Depression, indeed within days after Congress enacted the Agricultural Marketing Agreement Act of 1937 or the AMAA, the Legislature enacted the California Marketing Act of 1937 or the CMA. (See generally Stats.1937, ch. 404, § 1, p. 1329 et seq., as amended, codified at Food & Agr.Code, § 58601 et seq.)
Like the AMAA, the CMA declared, as one of the Legislature's policies, the establishing and maintaining of orderly marketing conditions for agricultural commodities in order to raise and support prices for their producers.
Also like the AMAA, the CMA authorized the Director of Agriculture of the State of Californiawho is now styled the Secretary of Food and Agriculture (Food & Agr.Code, § 50)to enter into "marketing agreements," i.e., contract-like arrangements with the producers and handlers of agricultural commodities concerning marketing matters, which would be binding, expressly, only on those signatory thereto, and would be exempt, impliedly, from all state antitrust laws.
Again like the AMAA, the CMA authorized the Director of Agriculture to issue "marketing orders," i.e., regulations governing marketing matters for the producers and handlers of agricultural commodities, which did the following: provided for participation in the administration of such orders by the regulated producers and handlers themselves; substantially restricted the terms of such orders generally to, among others, the determination of the existence and extent of any surplus, the limitation on total quantity marketed, the allotment of amounts for purchase, the *478 allotment of amounts for marketing, the regulation of periods for marketing, the establishment of reserve pools, the institution of grading and standards, and, impliedly, the conduct of research; and mandated that the regulated producers and handlers had to contribute funds to cover related expenses. It contained provisions relating to the termination of such orders, their coming into effect, and their remaining in effect, and, impliedly, the conduct of referenda. In light of features of this sort, the mechanism of regulation that such an order sets up is, essentially, self-regulation by the regulated producers and handlers themselves. (See Voss v. Superior Court (1996) 46 Cal.App.4th 900, 907, 918-924, 54 Cal.Rptr.2d 225.)
But, unlike the AMAA, the CMA authorized the Director of Agriculture to impose, among the terms of such a marketing order, the establishment of "plans for advertising and sales promotion to create new or larger markets for agricultural commodities," specifically, plans that are "directed toward increasing the sale of such commodity without reference to a particular brand," etc. (Stats.1937, ch. 404, § 1, pp. 1335-1336.) It mandated that the regulated producers and handlers subject to a marketing order with such a term had to contribute funds to cover related expenses.
Since 1937, the Legislature has amended the CMA on several occasions. As a general matter, the CMA has retained the core of the provisions described above, but has expanded beyond their periphery. Such expansion, however, is not worthy of note here.
In 1991, after the federal California Tree Fruit Agreement was terminated as to plums, there was no federal or state marketing agreement or order in place. The Secretary of Food and Agriculture then entered into a marketing agreement pursuant to the CMA with about 80 percent of the producers (apparently) and handlers of the fruit, evidently at their instigation, entitled the California Plum Marketing Agreement.
In 1992, the California Plum Marketing Agreement went into effect. It established a Plum Advisory Board, comprising producer-handlers and handlers, and authorized it to conduct research concerning plums and to engage in advertising, sales promotion, and market development. It was binding on its signatories only. It purportedly had several weaknesses, including an inability to require full participation, obtain adequate funding, and prevent free riders, and also an absence of provisions for quality standards and inspections.
In 1993, a group of plum producers and handlers, which called itself the Stone Fruit Coalition, approached the Secretary of Food and Agriculture, and requested him to issue a marketing order pursuant to the CMA, specifically a marketing order that the group itself proposed. (Voss v. Superior Court, supra, 46 Cal.App.4th at p. 904, 54 Cal.Rptr.2d 225.)
In 1994, the Secretary of Food and Agriculture issued a marketing order pursuant to the CMA, entitled the California Plum Marketing Program, which conformed to the one that the Stone Fruit Coalition proposed. (See Voss v. Superior Court, supra, 46 Cal.App.4th at pp. 904-906, 54 Cal.Rptr.2d 225.)
The California Plum Marketing Program provides for the establishment of a California Plum Marketing Board, which is virtually filled with, and totally controlled by, producers and/or producer-handlers of the fruit. In addition, and among other things, it provides for the board's administration of its terms. It also provides for the board's undertaking of activities extending to research; advertising, specifically generic advertising, along with sales promotion and market development; and the institution and implementation of quality standards and inspections. It provides as well for the board's assessment of funds from producers for expenses related to the foregoing activities, at a rate that may not *479 exceed $0.20 per 28-pound box, including $0.02 for research, $0.11 for generic advertising along with sales promotion and market development, and $0.07 for quality standards and inspections.

II
On October 31, 1994, Gerawan Farming, Inc., filed a complaint for declaratory and injunctive relief in the Superior Court of Tulare County against, among others, the California Secretary of Food and Agriculture in his official capacity, originally Henry J. Voss, then Ann M. Veneman, now William J. Lyons, Jr. It challenged the California Plum Marketing Program, which was issued by the secretary pursuant to the CMA, under provisions including the free speech clause of the First Amendment to the United States Constitution and the free speech clause of subdivision (a) of section 2 of article I of the California Constitution. It alleged facts reflecting the historical, statutory, and administrative background, as set out above, relating to the AMAA and Marketing Order No. 917 and to the CMA and the California Plum Marketing Program. It also alleged facts, liberally construed, to the following effect: It produces and handles plums; plums constitute a lawful product; it has developed, and uses, a brand for marketing purposes; it engages in commercial speech about its own branded plums through advertising; its message is not false or misleading; nonetheless, the California Plum Marketing Program compels it to fund commercial speech in the form of generic advertising about plums as a commodity against its will, and does so to some appreciable extent; the compulsion of funding reduces the amount of money available for its own advertising; the generic advertising, otherwise undescribed, "reflect[s] ... viewpoints," political and ideological as well as commercial, "to which it does not subscribe," and indeed with which it "vehemently disagrees."
Subsequently, in Glickman, a majority of the United States Supreme Court, in an opinion by Justice Stevens, concluded that Marketing Order No. 917, which was issued by the United States Secretary of Agriculture pursuant to the AMAA, did not implicate the right of parties including Gerawan to freedom of speech under the First Amendment by compelling funding of generic advertising. (Glickman v. Wileman Brothers & Elliott, Inc., supra, 521 U.S. at pp. 467-477, 117 S.Ct. 2130.) They indicated that, had such a right been implicated, the appropriate standard for use in determining whether it had been violated would have been the test of Abood v. Detroit Board of Education (1977) 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (hereafter sometimes Abood ) and its progeny, including Keller v. State Bar of California (1990) 496 U.S. 1, 110 S.Ct. 2228, 110 L.Ed.2d 1 (hereafter sometimes Keller ), which had not been used by the court belowwhich "involv[es] the compelled funding of speech" generally (Glickman v. Wileman Brothers & Elliott, Inc., supra, 521 U.S. at p. 474, fn. 18, 117 S.Ct. 2130)and not the test of Central Hudson Gas & Elec. v. Public Serv. Comm'n (1980) 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (hereafter sometimes Central Hudson), which had been used by the court belowwhich "involve[s] a restriction on commercial speech" (Glickman v. Wileman Brothers & Elliott, Inc., supra, 521 U.S. at p. 474, fn. 18, 117 S.Ct. 2130). In the principal dissenting opinion, Justice Souter concluded that the marketing order in question did indeed implicate a First Amendment right to freedom of speech, was subject to examination under the Central Hudson test, and did not survive muster thereunder. (Glickman v. Wileman Brothers & Elliott, Inc., supra, 521 U.S. at pp. 477-504, 117 S.Ct. 2130 (dis. opn. of Souter, J.).) In a separate dissenting opinion, Justice Thomas generally joined in Justice Souter's, but rejected the Central Hudson test, root and branch. (Glickman v. Wileman Brothers & Elliott, Inc., supra, 521 U.S. at pp. 504-506, 117 S.Ct. 2130 (dis. opn. of Thomas, J.).)
*480 The Secretary of Food and Agriculture moved for judgment on the pleadings on the ground that Gerawan's complaint did not allege facts sufficient to constitute a cause of action.[2] By order, the superior court granted the motion, but with leave to amend.
Gerawan proceeded to file an amended complaint. It challenged the California Plum Marketing Program under provisions including article I's free speech clause. It again alleged facts reflecting the historical, statutory, and administrative background, as set out above. Expanding somewhat the facts that it alleged previously, it also alleged facts, liberally construed, to the following effect: It produces and handles plums; plums constitute a lawful product; it has developed, and uses, a brand for marketing purposes; it engages in commercial speech about its own branded plums through advertising; its message is not false or misleading; nonetheless, the California Plum Marketing Program compels it to fund commercial speech in the form of generic advertising about plums as a commodity against its will, and does so in excess of $80,000 per year; the compulsion of funding reduces the amount of money available for its own advertising; it "disagrees" with, and indeed "abhors," the generic advertising, otherwise undescribed, both on political and ideological grounds, as "socialistic" and "collectivist," and also on commercial grounds, as "grouping all ... plums as though they are the same" and as "embarrassingly silly, idiotic and/or totally ineffective."
The Secretary of Food and Agriculture moved for judgment on the pleadings on the ground that Gerawan's amended complaint, like its original one, did not allege facts sufficient to constitute a cause of action. By order, the superior court granted the motion, this time without leave to amend. It stated that Gerawan "cite[d] no authority for its argument that the California Constitution extends protections against compelled speech ... greater than those provided in the United States Constitution which the United States Supreme Court [in Glickman] has held were not violated by" Marketing Order No. 917, which it said was "not substantively distinguishable from" the California Plum Marketing Program. It rendered judgment in the secretary's favor, and caused entry thereof.
After Gerawan filed a notice of appeal in the superior court, an appeal was docketed in the Court of Appeal for the Fifth Appellate District.
By a judgment announced in a unanimous opinion certified for publication, the Court of Appeal affirmed the judgment of the superior court. It apparently subjected to independent review the superior court's order granting the motion for judgment on the pleadings submitted by the Secretary of Food and Agriculture. It proceeded to sustain the order. It acknowledged that it found "persuasive some of the reasoning in Justice Souter's dissent" in Glickman. It nevertheless concluded that the California Plum Marketing Program does not implicate Gerawan's right to freedom of speech under the First Amendment's free speech clause, as construed by the Glickman majority. It determined that article I's free speech clause is not materially different from the First Amendment's. It attempted to render article I's free speech clause similar to the First Amendment's by construing article I's free speech clause as it believed other courts had construed the First Amendment's. It construed article I's free *481 speech clause thus under a "so-called `principle of deference,'" which it said operates when a state constitutional provision is "`similar'" in its "`language'" to a federal constitutional one. (Quoting Raven v. Deukmejian (1990) 52 Cal.3d 336, 353, 276 Cal.Rptr. 326, 801 P.2d 1077.) On this basis, it concluded that the California Plum Marketing Program does not implicate Gerawan's right to freedom of speech under article I's free speech clause.
Gerawan filed a petition for review. We granted its application.

III
The issue that we address on review is whether the California Plum Marketing Program, issued by the California Secretary of Food and Agriculture pursuant to the CMA, implicates Gerawan's right to freedom of speech under either the First Amendment to the United States Constitution or article I of the California Constitution by compelling funding of generic advertising.[3]

A
In the Bill of Rights, the First Amendment to the United States Constitution has stated since its ratification in 1791: "Congress shall make no law ... abridging the freedom of speech, or of the press...." (U.S. Const., 1st Amend.)
Under the First Amendment's free speech clause, "speech" includes written expression as well as spoken. (Barnes v. Glen Theatre, Inc. (1991) 501 U.S. 560, 576, 111 S.Ct. 2456, 115 L.Ed.2d 504 (cone. opn. of Scalia, J.); see, e.g., Dallas v. Stanglin (1989) 490 U.S. 19, 25, 109 S.Ct. 1591, 104 L.Ed.2d 18.)
In terms, the First Amendment's free speech clause prohibits the legislative branch of the government of the United States from making any "law ... abridging the freedom of speech, or of the press." (U.S. Const., 1st Amend.) In effect, it also bars the executive and judicial branches from taking any action with similar consequence. (New York Times Co. v. United States (1971) 403 U.S. 713, 715-717, 91 S.Ct. 2140, 29 L.Ed.2d 822 (cone. opn. of Black, J.); see Hudgens v. NLRB (1976) 424 U.S. 507, 513, 96 S.Ct. 1029, 47 L.Ed.2d 196 [stating that "[i]t is, of course, a commonplace that the constitutional guarantee of free speech is a guarantee ... against abridgment by government," including the "federal" "government," and not merely its legislative branch].)
Initially, the First Amendment's free speech clause constrained only the United States and its government. (See Barron v. Baltimore (1833) 32 U.S. (7 Pet.) 243, 247-250, 8 L.Ed. 672.) Today, through the Fourteenth Amendment's due process clause, it also constrains the several states and their governments. (E.g., McIntyre v. Ohio Elections Comm'n (1995) 514 U.S. 334, 336, fn. 1, 115 S.Ct. 1511, 131 L.Ed.2d 426; City of Ladue v. Gilleo (1994) 512 U.S. 43, 45, fn. 1, 114 S.Ct. 2038, 129 L.Ed.2d 36; Near v. Minnesota (1931) 283 U.S. 697, 707, 51 S.Ct. 625, 75 L.Ed. 1357; Gitlow v. People of State of New York (1925) 268 U.S. 652, 666, 45 S.Ct. 625, 69 *482 L.Ed. 1138; see Hudgens v. NLRB, supra, 424 U.S. at p. 513, 96 S.Ct. 1029 [stating that "[i]t is, of course, a commonplace that the constitutional guarantee of free speech is a guarantee ... against abridgment by government," including "state" "government," and not merely its legislative branch].)
The First Amendment's free speech clause specifies a "right to freedom of speech." (E.g., Bill Johnson's Restaurants, Inc. v. NLRB (1983) 461 U.S. 731, 743, 103 S.Ct. 2161, 76 L.Ed.2d 277; accord, e.g., Spallone v. United States (1990) 493 U.S. 265, 274, 110 S.Ct. 625, 107 L.Ed.2d 644.) It does so not explicitly but by implication, containing, as it does, only the phrase "freedom of speech" and not the word "right." (U.S. Const., 1st Amend.) It does not so much grant a right to freedom of speech, as it "safeguards" some such right "against encroachment" (Palko v. Connecticut (1937) 302 U.S. 319, 324, 58 S.Ct. 149, 82 L.Ed. 288, overruled on another point, Benton v. Maryland (1969) 395 U.S. 784, 794, 89 S.Ct. 2056, 23 L.Ed.2d 707).
The First Amendment's right to freedom of speech does not restrict itself "depending] upon the identity" or legal character of the speaker, "whether corporation, association, union, or individual." (First National Bank of Boston v. Bellotti (1978) 435 U.S. 765, 777, 98 S.Ct. 1407, 55 L.Ed.2d 707; accord, Pacific Gas & Elec. Co. v. Public Util, Comm'n (1986) 475 U.S. 1, 8, 106 S.Ct. 903, 89 L.Ed.2d 1 (plur. opn. of Powell, J.); Consolidated Edison Co. v. Public Serv. Comm'n (1980) 447 U.S. 530, 533, 100 S.Ct. 2326, 65 L.Ed.2d 319; see Va. Pharmacy Bd. v. Va. Consumer Council (1976) 425 U.S. 748, 756, 96 S.Ct. 1817, 48 L.Ed.2d 346.) What matters, rather, is the speech itself. (See Consolidated Edison Co. v. Public Serv. Comm'n, supra, 447 U.S. at p. 533, 100 S.Ct. 2326; First National Bank of Boston v. Bellotti supra, 435 U.S. at p. 777, 98 S.Ct. 1407.) That is because the right's "protection" is "afforded" not only to one who speaks but also to those who listen. (Va. Pharmacy Bd v. Va. Consumer Council, supra, 425 U.S. at p. 756, 96 S.Ct. 1817; see Pacific Gas & Elec. Co. v. Public Util. Comm'n, supra, 475 U.S. at p. 8, 106 S.Ct. 903 (plur. opn. of Powell, J.).) When the interests served by the speech at issue extend beyond those of the speaker to those of the listeners, the speaker, whoever or whatever it may be, may be deemed to possess the right in question. (See Pacific Gas & Elec. Co. v. Public Util. Comm'n, supra, 475 U.S. at p. 8,106 S.Ct. 903 (plur. opn. of Powell, J.); Va. Pharmacy Bd. v. Va. Consumer Council, supra, 425 U.S. at p. 756, 96 S.Ct. 1817; Consolidated Edison Co. v. Public Serv. Comm'n, supra, 447 U.S. at p. 533, 100 S.Ct. 2326; First National Bank of Boston v. Bellotti supra, 435 U.S. at p. 777, 98 S.Ct. 1407.)
In its nature, however, the First Amendment's right to freedom of speech is not absolute. (E.g., Board of Comm'rs, Wabaunsee Cty. v. Umbehr (1996) 518 U.S. 668, 675, 116 S.Ct. 2342, 135 L.Ed.2d 843; Chaplinsky v. New Hampshire (1942) 315 U.S. 568, 571, 62 S.Ct. 766, 86 L.Ed. 1031.) Thus, it is not the case that "where [it] exists it must prevail ...." (Konigsberg v. State Bar (1961) 366 U.S. 36, 49, 81 S.Ct. 997, 6 L.Ed.2d 105.)
Moreover, in its range, the First Amendment's right to freedom of speech is not unbounded. (See, e.g., Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston (1995) 515 U.S. 557, 566, 115 S.Ct. 2338, 132 L.Ed.2d 487; Hudgens v. NLRB, supra, 424 U.S. at p. 513, 96 S.Ct. 1029.) That is to say, it does not run against the world, but only against governmental actors as opposed to private parties. (E.g., Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston supra, 515 U.S. at p. 566, 115 S.Ct. 2338; Hudgens v. NLRB, supra, 424 U.S. at p. 513, 96 S.Ct. 1029.)
Also, in its scope, the First Amendment's right to freedom of speech is not unlimited. (E.g., Kingsley Books, Inc. v. *483 Brown (1957) 354 U.S. 436, 441, 77 S.Ct. 1325, 1 L.Ed.2d 1469; Near v. Minnesota, supra, 283 U.S. at p. 716, 51 S.Ct. 625.) Indeed, it was "not intended" to embrace all subjects. (Roth v. United States (1957) 354 U.S. 476, 483, 77 S.Ct. 1304, 1 L.Ed.2d 1498; see, e.g., Chaplinsky v. New Hampshire, supra, 315 U.S. at p. 572, 62 S.Ct. 766 [holding that the right in question does not protect "`fighting' words," which "by their very utterance inflict injury or tend to incite an immediate breach of the peace"]; R.A.V. v. St. Paul (1992) 505 U.S. 377, 383, 112 S.Ct. 2538, 120 L.Ed.2d 305 [following Chaplinsky].)
Fewer than 60 years ago, the United States Supreme Court introduced a dichotomy in the jurisprudence of the First Amendment's free speech clause between commercial speech, on the one side, and noncommercial speech, including that which is political or ideological in character, on the other.
"Commercial speech," at its core, is speech that does "no more than propose a commercial transaction" (Pittsburgh Press Co. v. Pittsburgh Human Rel. Comm'n (1973) 413 U.S. 376, 385, 93 S.Ct. 2553, 37 L.Ed.2d 669), and, more broadly, is speech that goes beyond proposing such a transaction but yet "relate[s] solely to the economic interests of the speaker and its audience" (Central Hudson Gas & Elec. v. Public Serv. Comm'n, supra, 447 U.S. at p. 561, 100 S.Ct. 2343). (Cincinnati v. Discovery Network, Inc. (1993) 507 U.S. 410, 420-423, 113 S.Ct. 1505, 123 L.Ed.2d 99.)
By contrast, "political speech" is speech that deals with "`governmental affairs'" (First National Bank of Boston v. Bellotti, supra, 435 U.S. at p. 777, 98 S.Ct. 1407), and "ideological speech" (Schad v. Mount Ephraim (1981) 452 U.S. 61, 65, 101 S.Ct. 2176, 68 L.Ed.2d 671) is speech that apparently concerns itself with "philosophical," "social," "artistic," "economic," "literary," "ethical," and similar matters (Abood v. Detroit Board of Education, supra, 431 U.S. at p. 231, 97 S.Ct. 1782 [considering the First Amendment's right to "freedom" of "association," which is evidently embraced by its right to freedom of speech]).
The First Amendment's right to freedom of speech protects political speech. (Schad v. Mount Ephraim, supra, 452 U.S. at p. 65, 101 S.Ct. 2176.) It likewise protects ideological speech. (Ibid.)
The First Amendment's right to freedom of speech also protects commercial speech. (E.g., Va. Pharmacy Bd. v. Va. Consumer Council, supra, 425 U.S. at pp. 761-770, 96 S.Ct. 1817.) But it protects it, as it were, only somewhat (Va. Pharmacy Bd. v. Va. Consumer Council, supra, 425 U.S. at p. 758, 96 S.Ct. 1817) in comparison with noncommercial speech (Florida Bar v. Went For It, Inc. (1995) 515 U.S. 618, 623, 115 S.Ct. 2371, 132 L.Ed.2d 541; Zauderer v. Office of Disciplinary Counsel (1985) 471 U.S. 626, 637, 105 S.Ct. 2265, 85 L.Ed.2d 652; Central Hudson Gas & Elec. v. Public Serv. Comm'n, supra, 447 U.S. at pp. 563-564, 100 S.Ct. 2343), including that which is political or, evidently, ideological in character (see Dun & Bradstreet, Inc. v. Greenmoss Builders (1985) 472 U.S. 749, 758, fn. 5, 105 S.Ct. 2939, 86 L.Ed.2d 593 (plur. opn. of Powell, J.)).
When the United States Supreme Court introduced its commercial speech/noncommercial speech dichotomy in First Amendment jurisprudence fewer than 60 years ago, it held that the First Amendment's right to freedom of speech did not protect commercial speech at all. (Valentine v. Chrestensen (1942) 316 U.S. 52, 54-55, 62 S.Ct. 920, 86 L.Ed. 1262.) When it revisited the issue somewhat more than 30 years later, it held that the right in question did, in fact, protect such speech (Va. Pharmacy Bd. v. Va. Consumer Council, supra, 425 U.S. at pp. 761-770, 96 S.Ct. 1817), albeit, as stated, only somewhat. The right affords such protection as it does to "truthful *484 and nonmisleading ... messages about lawful products and services." (44 Liquormart, Inc. v. Rhode Island (1996) 517 U.S. 484, 496, 116 S.Ct. 1495, 134 L.Ed.2d 711 (plur. opn. of Stevens, J.).) It affords none whatsoever to other sorts of messages about other sorts of products or services. (See Central Hudson Gas & Elec. v. Public Serv. Comm'n, supra, 447 U.S. at p. 563, 100 S.Ct. 2343.)
The First Amendment's right to freedom of speech is implicated, of course, in the act of speaking. The relationship is tight and direct. The right in question comprises both a "right to speak freely" and also a "right to refrain from" doing so "at all." (Wooley v. Maynard (1977) 430 U.S. 705, 714, 97 S.Ct. 1428, 51 L.Ed.2d 752; accord, Riley v. National Federation of Blind (1988) 487 U.S. 781, 796-797, 108 S.Ct. 2667, 101 L.Ed.2d 669; Harper & Row v. Nation Enterprises (1985) 471 U.S. 539, 559, 105 S.Ct. 2218, 85 L.Ed.2d 588; Board of Education v. Barnette (1943) 319 U.S. 624, 633-634, 63 S.Ct. 1178, 87 L.Ed. 1628.) For speech results from what a speaker chooses to say and what he chooses not to say. (See Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston supra, 515 U.S. at p. 573, 115 S.Ct. 2338; Riley v. National Federation of Blind, supra, 487 U.S. at pp. 796-797, 108 S.Ct. 2667; Pacific Gas & Elec. Co. v. Public Util. Comm'n, supra, 475 U.S. at p. 11, 106 S.Ct. 903 (plur. opn. of Powell, J.).) Hence, the right in question is put at risk both by prohibiting a speaker from saying what he otherwise would say and also by compelling him to say what he otherwise would not say.
The First Amendment's right to freedom of speech may also be implicated in the use of money. The relationship is looser and less direct. (See, e.g., Board of Regents of the University of Wisconsin System v. Southworth (2000) 529 U.S. 217, 227-236, 120 S.Ct. 1346, 1353-1357, 146 L.Ed.2d 193; Nixon v. Shrink Missouri Government PAC (2000) 528 U.S. 377, 385-386, 120 S.Ct. 897, 903-905, 145 L.Ed.2d 886; Buckley v. Valeo (1976) 424 U.S. 1, 18-23, 96 S.Ct. 612, 46 L.Ed.2d 659 (per curiam ); see also Secretary of State of Md. v. J.H. Munson Co. (1984) 467 U.S. 947, 967, fn. 16, 104 S.Ct. 2839, 81 L.Ed.2d 786.) But it is real all the same. That is because "money," even if it "is not" itself "speech" (Nixon v. Shrink Missouri Government PAC, supra, 528 U.S. at pp. 398-399, 120 S.Ct. at p. 910 (cone. opn. of Stevens, J.); accord, id. at p. 400,120 S.Ct. at p. 911 (cone. opn. of Breyer, J.)), nevertheless "enables speech" (id. at p. 400, 120 S.Ct. at p. 911 (cone. opn. of Breyer, J.)). Just as speech results from what a speaker chooses to say and what he chooses not to say, so too it results from what speech a speaker chooses to fund and what speech he chooses not to fund. The right in question comprises both a right to fund speech meaningfully (see, e.g., Citizens Against Rent Control v. Berkeley (1981) 454 U.S. 290, 300, 102 S.Ct. 434, 70 L.Ed.2d 492; First National Bank of Boston v. Bellotti, supra, 435 U.S. at pp. 775-786, 98 S.Ct. 1407) and also a right to refrain from doing so altogether (see, e.g., Lehnert v. Ferris Faculty Assn. (1991) 500 U.S. 507, 516-517, 111 S.Ct. 1950, 114 L.Ed.2d 572; Keller v. State Bar of California, supra, 496 U.S. at pp. 9-17, 110 S.Ct. 2228; see also Machinists v. Street (1961) 367 U.S. 740, 746-770, 81 S.Ct. 1784, 6 L.Ed.2d 1141 [statutory construction under the shadow of, inter alia, the First Amendment's right to freedom of speech]; cf. Abood v. Detroit Board of Education, supra, 431 U.S. at p. 222, 97 S.Ct. 1782 [considering the First Amendment's right to association] ). For, in words written by Thomas Jefferson specifically about religious speech, but with general applicability, "to compel a man to furnish contributions of money for the propagation of opinions which he disbelieves and abhors, is sinful and tyrannical...." (Jefferson, A Bill for Establishing Religious Freedom (June 12, 1779), reprinted in 5 The Founders' Constitution (Kurland & Lerner edits.1987) p. 77.) Hence, it is put at risk both by prohibiting *485 a speaker from funding speech that he otherwise would fund and also by compelling him to fund speech that he otherwise would not fund.

B
Comprising the Declaration of Rights, article I of the California Constitution states in subdivision (a) of section 2: "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press."
Article I's free speech clause took its present language and designation in 1980. (Cal. Const., art. I, § 2, subd. (a), as amended June 3, 1980.) From there, it traces itself back to 1974, with the same language, but with a different designation as section 2. (Id., art. I, § 2, added Nov. 5, 1974.) Then to 1879, when the present California Constitution was framed, with a different designation as section 9, but with almost the same language: "Every citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press." (Id., art. I, former § 9 (as adopted May 7, 1879).) And then to 1849, when the original California Constitution was framed, with the same language and designation. (Cal. Const, of 1849, art. I, § 9.)
Article I's free speech clause finds its prehistory outside of California in the New York Constitution (Los Angeles Alliance for Survival v. City of Los Angeles (2000) 22 Cal.4th 352, 366, fn. 9, 93 Cal.Rptr.2d 1, 993 P.2d 334) and ultimately, perhaps, in Blackstone's Commentaries on the Laws of England (Los Angeles Alliance for Survival v. City of Los Angeles, supra, 22 Cal.4th at p. 366, fn. 9, 93 Cal.Rptr.2d 1, 993 P.2d 334; Dailey v. Superior Court (1896) 112 Cal. 94, 98, 44 P. 458). But not in the First Amendment to the United States Constitution. (E.g., Robins v. Pruneyard Shopping Center (1979) 23 Cal.3d 899, 908, 153 Cal.Rptr. 854, 592 P.2d 341, affd. sub nom. Pruneyard Shopping Center v. Robins (1980) 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741; see, e.g., Grodin, Some Reflections on State Constitutions (1988) 15 Hastings Const. L.Q. 391, 395.)
Although the designation of article I's free speech clause has changed appreciably over the years, from section 9 to section 2 to subdivision (a) of section 2, its language has not. (See Los Angeles Alliance for Survival v. City of Los Angeles, supra, 22 Cal.4th at pp. 365-366, 93 Cal. Rptr.2d 1, 993 P.2d 334.)
It is beyond peradventure that article I's free speech clause enjoys existence and force independent of the First Amendment's. In section 24, article I states, in these very terms, that "[r]ights guaranteed by [the California] Constitution are not dependent on those guaranteed by the United States Constitution." This statement extends to all such rights, including article I's right to freedom of speech. For the California Constitution is now, and has always been, a "document of independent force and effect particularly in the area of individual liberties." (People v. Hannon (1977) 19 Cal.3d 588, 607, fn. 8, 138 Cal. Rptr. 885, 564 P.2d 1203 [speaking specifically of the present California Constitution]; accord, e.g., People v. Brisendine (1975) 13 Cal.3d 528, 549-550, 119 Cal. Rptr. 315, 531 P.2d 1099.)
Article I's free speech clause is at least as broad as the First Amendment's, and its right to freedom of speech is at least as great. (See, e.g., Los Angeles Alliance for Survival v. City of Los Angeles, supra, 22 Cal.4th at pp. 366-367, 93 Cal. Rptr.2d 1, 993 P.2d 334; Griset v. Fair Political Practices Comm. (1994) 8 Cal.4th 851, 866, fn. 5, 35 Cal.Rptr.2d 659, 884 P.2d 116; Blatty v. New York Times Co. (1986) 42 Cal.3d 1033, 1041, 232 Cal.Rptr. 542, 728 P.2d 1177; Spiritual Psychic Science Church v. City of Azusa (1985) 39 Cal.3d 501, 519, 217 Cal.Rptr. 225, 703 P.2d 1119; San Jose Mercury-News v. Municipal *486 Court (1982) 30 Cal.3d 498, 508, 179 Cal. Rptr. 772, 638 P.2d 655; People v. Glaze (1980) 27 Cal.3d 841, 844, fn. 2, 166 Cal. Rptr. 859, 614 P.2d 291; Robins v. Pruneyard Shopping Center, supra, 23 Cal.3d at p. 908, 153 Cal.Rptr. 854, 592 P.2d 341; Wilson v. Superior Court (1975) 13 Cal.3d 652, 658, 119 Cal.Rptr. 468, 532 P.2d 116; Dailey v. Superior Court, supra, 112 Cal. at p. 98, 44 P. 458.)
Hence, as to the points noted in our discussion of the First Amendment's free speech clause and its right to freedom of speech, article I's free speech clause and its right to freedom of speech, mutatis mutandis, are at least in accord.
Thus, under article I's free speech clause, as under the First Amendment's, "speech" includes written expression as well as spoken. Indeed, under article I's free speech clause, it does so in terms. (Cal. Const., art. I, § 2, subd. (a).)
Also, article I's right to freedom of speech, like the First Amendment's, does not restrict itself depending upon the identity or legal character of the speaker. (See Jacoby v. State Bar (1977) 19 Cal.3d 359, 363, fn. 2, & 368, 138 Cal. Rptr. 77, 562 P.2d 1326 [semble]; People v. American Automobile Ins. Co. (1955) 132 Cal.App.2d 317, 322, 328, 282 P.2d 559 [semble].) What matters is the speech itself. (See Jacoby v. State Bar, supra, 19 Cal.3d at pp. 363, fn. 2, & 368, 138 Cal. Rptr. 77, 562 P.2d 1326.) That is because the right's protection is afforded not only to one who speaks but also to those who listen. (Ibid.) When the interests served by the speech at issue extend beyond those of the speaker to those of the listeners, the speaker, we think, whoever or whatever it may be, may be deemed to possess the right in question.
Article I's right to freedom of speech, like the First Amendment's, is implicated in speaking itself. Because speech results from what a speaker chooses to say and what he chooses not to say, the right in question comprises both a right to speak freely and also a right to refrain from doing so at all, and is therefore put at risk both by prohibiting a speaker from saying what he otherwise would say and also by compelling him to say what he otherwise would not say.
Similarly, article I's right to freedom of speech, like the First Amendment's, may also be implicated in the use of money. Because speech results, through money's enabling, from what speech a speaker chooses to fund and what speech he chooses not to fund, the right in question comprises both a right to fund speech meaningfully and also a right to refrain from doing so altogether, and is therefore put at risk both by prohibiting a speaker from funding speech that he otherwise would fund and also by compelling him to fund speech that he otherwise would not fund.
As a general rule, however, article I's free speech clause and its right to freedom of speech are not only as broad and as great as the First Amendment's, they are even "broader" and "greater." (Dailey v. Superior Court, supra, 112 Cal. at p. 98, 44 P. 458; accord, Los Angeles Alliance for Survival v. City of Los Angeles, supra, 22 Cal.4th at pp. 366-367, 93 Cal.Rptr.2d 1, 993 P.2d 334; see, e.g., Griset v. Fair Political Practices Comm., supra, 8 Cal.4th at p. 866, fn. 5, 35 Cal. Rptr.2d 659, 884 P.2d 116; Blatty v. New York Times Co., supra, 42 Cal.3d at p. 1041, 232 Cal.Rptr. 542, 728 P.2d 1177; Spiritual Psychic Science Church v. City of Azusa, supra, 39 Cal.3d at p. 519, 217 Cal.Rptr. 225, 703 P.2d 1119; San Jose Mercury-News v. Municipal Court, supra, 30 Cal.3d at p. 508, 179 Cal.Rptr. 772, 638 P.2d 655; People v. Glaze, supra, 27 Cal.3d at p. 844, fn. 2, 166 Cal.Rptr. 859, 614 P.2d 291; Robins v. Pruneyard Shopping Center, supra, 23 Cal.3d at p. 908, 153 Cal. Rptr. 854, 592 P.2d 341; Wilson v. Superior Court, supra, 13 Cal.3d at p. 658, 119 Cal.Rptr. 468, 532 P.2d 116.)
*487 It is, of course, true that this general rule does not preclude the possibility of exception. (See Los Angeles Alliance for Survival v. City of Los Angeles, supra, 22 Cal.4th at p. 367, 93 Cal.Rptr.2d 1, 993 P.2d 334.)
But, at least in the following particulars, it is indeed the general rule, and not any exception, that applies.
First, article I's free speech clause, unlike the First Amendment's, specifies a "right" to freedom of speech explicitly and not merely by implication. (Friesen, Should California's Constitutional Guarantees of Individual Rights Apply Against Private Actors? (1989) 17 Hastings Const. L.Q. 111, 118, 119-122; Note, Rediscovering the California Declaration of Rights (1974) 26 Hastings L.J. 481, 494; see Crosby, New Frontiers: Individual Rights Under the California Constitution (1989) 17 Hastings Const. L.Q. 81, 81-82.) Article I and the First Amendment are not dissimilar in providing, in the First Amendment's words, that "Congress shall make no law ... abridging the freedom of speech, or of the press" (U.S. Const., 1st Amend.), and, in article I's, that "[a] law may not restrain or abridge liberty of speech or press" (Cal. Const., art. I, § 2, subd. (a)). But, otherwise, article I and the First Amendment are altogether different, because only article I, and not the First Amendment, affirmatively declares as a "right" that "[e]very person may freely speak, write and publish his or her sentiments on all subjects" (Cal. Const., art. I, § 2, subd. (a)). (Crosby, New Frontiers: Individual Rights Under the California Constitution, supra, 17 Hastings Const. L.Q. at pp. 81-32; Friesen, Should California's Constitutional Guarantees of Individual Rights Apply Against Private Actors?, supra, 17 Hastings Const. L.Q. at pp. 118, 119-122; see Fritz, More Than "Shreds and Patches": California's First Bill of Rights (1989) 17 Hastings Const. L.Q. 13, 22, 23, 31; Note, Rediscovering the California Declaration of Rights, supra, 26 Hastings L.J. at pp. 493-495, 510.) Hence, article I itself grants a right to freedom of speech, and does not merely safeguard some such right against encroachment.
Second, article I's right to freedom of speech, unlike the First Amendment's, is unbounded in range. It runs against the world, including private parties as well as governmental actors. (See Robins v. Pruneyard Shopping Center, supra, 23 Cal.3d at pp. 908-911, 153 Cal.Rptr. 854, 592 P.2d 341; Fritz, More Than "Shreds and Patches": California's First Bill of Rights, supra, 17 Hastings Const. L.Q. at p. 31 [semble]; Friesen, Should California's Constitutional Guarantees of Individual Rights Apply Against Private Actors?, supra, 17 Hastings Const. L.Q. at pp. 118, 119-122 [semble ]; but see Feminist Women's Health Center v. Blythe (1995) 32 Cal.App.4th 1641, 1665, 39 Cal. Rptr.2d 189 [stating in dictum that "[f]ree speech provisions of the state and federal Constitutions protect citizens from restrictions imposed by governmental action," and that "[f]ree speech concerns may be raised as a shield against injunctive relief only because the effectuation of such relief entails government action"].) An argument has been made that "it is the essential nature of constitutions that they are meant to restrain only" governmental actors and not private parties too. (Friesen, Should California's Constitutional Guarantees of Individual Rights Apply Against Private Actors?, supra, 17 Hastings Const. L.Q. at p. 116, italics in original [referring to, but not embracing, such an argument]; see id. at pp. 122, fn. 41, 123, fn. 44, & 126, fn. 54 [similar].) But this argument overlooks the peculiar character of constitutions dating to the 19th century, which are not so narrow. (See Fritz, The American Constitutional Tradition Revisited: Preliminary Observations on State Constitution-Making in the Nineteenth Century West (1994) 25 Rutgers L.J. 945, 964-971.) Among such constitutions, ours must be numbered. (See Cal. Const, of 1849, art. XI, § 14 [expressly granting wives a right *488 to separate property over against their husbands]; Cal. Const., art. XX, former § 8 (as adopted May 7, 1879) [impliedly granting husbands and wives a right to separate property the one against the other].)
Third, article I's right to freedom of speech, unlike the First Amendment's, is "unlimited" in scope. (Dailey v. Superior Court, supra, 112 Cal. at p. 97, 44 P. 458; see Aguilar v. Avis Rent A Car System, Inc. (1999) 21 Cal.4th 121, 143, 87 Cal.Rptr.2d 132, 980 P.2d 846 (lead opn. of George, C.J.) [semble: distinguishing Dailey on another point].) Whereas the First Amendment does not embrace all subjects, article I does indeed do so, in ipsissimis verbis: "Every person may freely speak, write and publish his or her sentiments on all subjects ...." (Cal. Const., art. I, § 2, subd. (a), italics added.) These words are "qualified only by" those that follow (Pines v. Tomson (1984) 160 Cal.App.3d 370, 393, 206 Cal.Rptr. 866 (per Arabian, J.)), which make anyone who "abuse[s] ... this right" "responsible" for his misconduct (Cal. Const., art. I, § 2, subd. (a)).
Within its "unlimited" scope (Dailey v. Superior Court, supra, 112 Cal. at p. 97, 44 P. 458), which expressly embraces "all subjects" (Cal. Const., art. I, § 2, subd. (a)), article I's right to freedom of speech protects political speech and ideological speech. (See Wilson v. Superior Court, supra, 13 Cal.3d at p. 658, 119 Cal.Rptr. 468, 532 P.2d 116 [dealing with speech that was political in character]; People v. American Automobile Ins. Co., supra, 132 Cal.App.2d at pp. 318-328, 282 P.2d 559 [dealing with speech that was, at least in aspect, ideological in character].)
It is not otherwise with respect to article I's right to freedom of speech and commercial speech. Which is to say, as we shall explain, the right in question protects such speechsurely so in the form of truthful and nonmisleading messages about lawful products and services, the kind with which we are here concerned.[4]
That article I's right to freedom of speech protects commercial speech, at least in the form of truthful and nonmisleading messages about lawful products and services, is implied through the specific language of the free speech clause in its precise setting. Again: "Every person may freely speak, write and publish his or her sentiments on all subjects," with the sole qualification that anyone who "abuse[s] ... this right" is "responsible" for his misconduct. (Cal. Const., art. I, § 2, subd. (a), italics added.) Plainly, this "wording ... does not exclude" commercial speech from its "protection." (Friesen, State Constitutional Law: Litigating Individual Rights, Claims and Defenses, supra, § 5-2(b)(4), p. 274.)
That article I's right to freedom of speech protects commercial speech, at least in the form of truthful and nonmisleading messages about lawful products and services, is expressed in the broad context of the free speech clause in the world at large.
Let us focus initially on the circumstances surrounding article I's free speech clause at its drafting for the original California Constitution of 1849.
Protection for commercial speech, at least in the form of truthful and nonmisleading messages about lawful products and services, must have practically been assumed at that time.
One fact is relevant by its absence: The United States Supreme Court had not yet introduced its commercial speech/noncommercial *489 speech dichotomy in First Amendment jurisprudence, and would not do so for almost a century.
More to the point, from the very moment of independence through 1849, American legislatures had kept commercial speech free from regulation by statute, except as to products and services that were unlawful in the jurisdiction in question, such as lotteries in New Jersey and Pennsylvania, horse racing in Connecticut and Pennsylvania, and unlicensed innkeeping in Rhode Island. (Troy, Advertising: Not "Low Value" Speech, supra, 16 Yale J. on Reg. at pp. 103-105.) And in the same period, American courts had similarly kept commercial speech free from regulation by common law, except as to messages that were false or misleading in their particulars, and then only to the extent that they were not immunized by the doctrine of caveat emptor. (Id. at p. 104; see id. at pp. 106-107.)[5] Facts of this sort should cause no surprise. Since colonial times, commercial speech, operating through advertising, had played a major role in the life of the press, primarily as a source of revenue but also as a kind of editorial content, inasmuch as it was "thought to have independent value in educating and informing the reading public." (Troy, Advertising: Not "Low Value" Speech, supra, 16 Yale J. on Reg. at p. 100; see 44 Liquormart, Inc. v. Rhode Island, supra, 517 U.S. at p. 495, 116 S.Ct. 1495 (plur. opn. of Stevens, J.).) And, of course, since colonial times, the press had itself played a major role in the life of the polity. (Troy, Advertising: Not "Low Value" Speech, supra, 16 Yale J. on Reg. at pp. 97-101; see Franklin, Apology for Printers (June 10, 1731), reprinted in 1 Papers of Benjamin Franklin (Labaree et al. edits. 1959) pp. 194-199.)
In California itself in 1849, the prevailing political, legal, and social culture was that of Jacksonian democracy. (See Fritz, More Than "Shreds and Patches": California's First Bill of Rights, supra, 17 Hastings Const. L.Q. at pp. 24-26, 33; Scheiber, Race, Radicalism, and Reform: Historical Perspective on the 1879 California Constitution (1989) 17 Hastings Const. L.Q. 35, 37.) Jacksonian democracy was animated by "ideals of equality and open opportunity." (Scheiber, Race, Radicalism, and Reform: Historical Perspective on the 1879 California Constitution, supra, 17 Hastings Const. L.Q. at p. 37, fn. 8.) Those ideals worked themselves out in a "liberal, market-oriented, economic individualism." (Johnson, Founding the Far West (1992) p. 57.) What such individualism presupposed, and produced, was wide and unrestrained speech about economic matters generally, including, obviously, commercial affairs. Remember the year 1849. "[A]fter the discovery of gold in 1848," "California attracted" a "rush of humanity." (Fritz, Rethinking the American Constitutional Tradition: National Dimensions in the Formation of State Constitutions (1995) 26 Rutgers L.J. 969, 975.) These menfor they were largely menwere "essentially individualistic, greedy, and acquisitive gold-seekers." (Ibid.) It was such who framed the original California Constitution, including article I's free speech clause. (Fritz, Rethinking the American Constitutional Tradition: National Dimensions in the Formation of State Constitutions, supra, 26 Rutgers L.J. at p. 975.)
When we turn our eye to article I's free speech clause at its drafting for the present California Constitution of 1879, we find no reason to reject protection for commercial speech, at least in the form of truthful and nonmisleading messages about lawful *490 products and services. The language in 1879 was identical to that in 1849. The United States Supreme Court had not yet introduced its commercial speech/noncommercial speech dichotomy in First Amendment jurisprudence, and would not do so for more than 60 years. In addition, the political, legal, and social culture of Jacksonian democracy had not passed, with its equality and open opportunity, economic individualism, and wide and unrestrained commercial speech. American legislatures continued to keep commercial speech free from regulation by statute, except as to products and services that were unlawful in the jurisdiction in question. (Troy, Advertising: Not "Low Value" Speech, supra, 16 Yale J. on Reg. at pp. 111-113.) This was evidently true of the California Legislature, which kept commercial speech unregulated except for products and services that it made unlawful, such as lotteries (see Pen.Code, §§ 319-322, 324-326 (1872) [criminalizing lotteries]; id., § 323 (1872) [criminalizing the advertising thereof] ), abortions (see id., former §§ 274-275 (1872) [criminalizing abortions]; id., former § 311, subd. 4 (1872) [criminalizing the advertising thereof] ), and obscene or indecent books and other items (see id., former § 311, subd. 3 (1872) [criminalizing obscene or indecent books and other items]; id., former § 311, subd. 4 (1872) [criminalizing the advertising thereof]). American courts continued to keep commercial speech free from regulation by common law, except as to messages that were false or misleading in their particulars, and then only to the extent that they were not immunized by the doctrine of caveat emptor. (See Troy, Advertising: Not "Low Value" Speech, supra, 16 Yale J. on Reg. at pp. 104, 106, 111-113.) This was apparently true of California courts, for there is no indication in reported decisions to the contrary.
Proceeding from 1879 to 1974, when article I's free speech clause was first amended, we again find no reason to reject protection for commercial speech, at least in the form of truthful and nonmisleading messages about lawful products and services. Although the numerical designation was different, the language was virtually identical. By 1974, the United States Supreme Court had introduced its commercial speech/noncommercial speech dichotomy in First Amendment jurisprudence, and indeed had held that the First Amendment's right to freedom of speech did not protect commercial speech at all. But there is no basis on which to conclude that the 1974 amendment of article I's free speech clause incorporated what had transpired in the intervening years, including the United States Supreme Court's First Amendment commercial speech/noncommercial speech dichotomy with its then nonprotection for commercial speech.
Advancing finally from 1974 to 1980, when article I's free speech clause was last amended, we yet again find no reason to reject protection for commercial speech, at least in the form of truthful and nonmisleading messages about lawful products and services. Although the numerical designation was different, the language was absolutely identical. By 1980, the United States Supreme Court, while retaining its commercial speech/noncommercial speech dichotomy in First Amendment jurisprudence, had made a volte-face to hold that the First Amendment's right to freedom of speech did, in fact, protect commercial speech, albeit only somewhat. There is no basis on which to conclude that the 1980 amendment of article I's free speech clause incorporated what had transpired in the intervening years, including the United States Supreme Court's First Amendment commercial speech/noncommercial speech dichotomy with its then, and current, "somewhat" protection for commercial speech.[6]

*491 C
The first question that we address is, Does the California Plum Marketing Program, issued by the California Secretary of Food and Agriculture pursuant to the CMA, implicate Gerawan's right to freedom of speech under the free speech clause of the First Amendment to the United States Constitution by compelling funding of generic advertising?
The answer that we give is, No.
At the threshold, we note what hardly needs noting. Although a corporation, Gerawan may at least be deemed to possess a First Amendment right to freedom of speech, whether or not it does so strictly speaking. That is because the interests served by its commercial speech about its plums extend beyond itself. Such interests include those of its audience of "consumer[s]," who may or may not choose to buy its fruit. (Va. Pharmacy Bd. v. Va. Consumer Council, supra, 425 U.S. at p. 763, 96 S.Ct. 1817; see Rubin v. Coors Brewing Co. (1995) 514 U.S. 476, 481-82, 115 S.Ct. 1585, 131 L.Ed.2d 532.) Such interests also include those of "society" in general (Va. Pharmacy Bd. v. Va. Consumer Council, supra, 425 U.S. at p. 764, 96 S.Ct. 1817; see Rubin v. Coors Brewing Co., supra, 514 U.S. at p. 481, 115 S.Ct. 1585). The information so communicated is "indispensable to the proper allocation of resources in a free enterprise system" like ours (Va. Pharmacy Bd. v. Va. Consumer Council, supra, 425 U.S. at p. 765, 96 S.Ct. 1817; accord, Rubin v. Coors Brewing Co., supra, 514 U.S. at p. 481, 115 S.Ct. 1585), because it literally "informs the numerous private decisions that drive the system" (Rubin v. Coors Brewing Co., supra, 514 U.S. at p. 481, 115 S.Ct. 1585, italics added; accord, Va. Pharmacy Bd v. Va. Consumer Council, supra, 425 U.S. at p. 765, 96 S.Ct. 1817).
As stated, the First Amendment's right to freedom of speech protects commercial speech, albeit only somewhat in comparison with noncommercial speech, including that which is political or ideological in character. It is implicated in speaking *492 itself. It may also be implicated in the use of money.
The First Amendment's right to freedom of speech allows compelling one who engages in commercial speech to say through advertising what he otherwise would not say, even about a lawful product or service, in order to render his message truthful and not misleading. (See, e.g., Va. Pharmacy Bd. v. Va. Consumer Council, supra, 425 U.S. at pp. 771-772, 96 S.Ct. 1817.) Consumer protection is the justificationapparently, the sole one. (See, e.g., Rubin v. Coors Brewing Co., supra, 514 U.S. at pp. 492-493, 115 S.Ct. 1585 (cone. opn. of Stevens, J.); Va. Pharmacy Bd. v. Va. Consumer Council, supra, 425 U.S. at pp. 771-772, 96 S.Ct. 1817.) When the commercial speaker's message is already truthful and nonmisleading, however, compulsion of speech is not supported by the consumer protection rationale, but must be supported, if at all, by some rationale applicable to all speech, noncommercial as well as commercial. (See, e.g., Rubin v. Coors Brewing Co., supra, 514 U.S. at pp. 492-93, 115 S.Ct. 1585 (cone, opn. of Stevens, J.).)
Similarly, the First Amendment's right to freedom of speech allows compelling one who engages in commercial speech to fund speech in the form of advertising that he would otherwise not, even about a lawful product or service, in order to render his message truthful and not misleading. (See, e.g., Va. Pharmacy Bd. v. Va. Consumer Council, supra, 425 U.S. at pp. 771-772, 96 S.Ct. 1817.) Again, consumer protection is theapparently solejustification. (See, e.g., Rubin v. Coors Brewing Co., supra, 514 U.S. at pp. 492-493, 115 S.Ct. 1585 (cone. opn. of Stevens, J.); Va. Pharmacy Bd. v. Va. Consumer Council, supra, 425 U.S. at pp. 771-772, 96 S.Ct. 1817.) When the commercial speaker's message is already truthful and nonmisleading, however, compulsion of funding is not supported by the consumer protection rationale, but must be supported, if at all, by some rationale applicable to all speech, noncommercial as well as commercial. (Cf. Rubin v. Coors Brewing Co., supra, 514 U.S. at pp. 492-493, 115 S.Ct. 1585 (cone. opn. of Stevens, J.) [dealing with compulsion of speech].)
It would therefore appear that, without more, the First Amendment's right to freedom of speech would not allow compelling one who engages in commercial speech to say through advertising what he otherwise would not say, when his message is about a lawful product or service and is not otherwise false or misleading.
It would similarly appear that, without more, the First Amendment's right to freedom of speech would not allow compelling one who engages in commercial speech to fund speech in the form of advertising that he would otherwise not, when his message is about a lawful product or service and is not otherwise false or misleading.
Appearances, however, deceive.
In Glickman, a majority sustained Marketing Order No. 917, issued by the United States Secretary of Agriculture pursuant to the AMAA, against a challenge by Gerawan, among others, that it violated their First Amendment right to freedom of speech by compelling funding of generic advertising.
At the outset, the Glickman majority "stress[ed] the importance of the ... context" established by the AMAA. (Glickman v. Wileman Brothers & Elliott, Inc., supra, 521 U.S. at p. 469, 117 S.Ct. 2130.) They also emphasized that Marketing Order No. 917 was a "detailed" "regulatory scheme" that had "displaced many aspects of independent business activity that characterize other portions of the economy in which competition is fully protected by the antitrust laws." (Ibid.)[7] It "compelled" *493 Gerawan and the rest "to fund the generic advertising at issue ... as a part of a broader collective enterprise in which their freedom to act independently" was "already constrained." (Glickman v. Wileman Brothers & Elliott, Inc., supra, 521 U.S. at p. 469, 117 S.Ct. 2130.)
The Glickman majority stated that the "central message of the generic advertising" under Marketing Order No. 917 was "that `California Summer Fruits' are wholesome, delicious, and attractive to discerning shoppers." (Glickman v. Wileman Brothers & Elliott, Inc., supra, 521 U.S. at p. 462, 117 S.Ct. 2130.) Such generic advertising was evidently intended not to prevent or correct any otherwise false or misleading message in the interest of consumer protection, but solely to develop markets and promote sales in the interest of producer welfare. (See id. at pp. 462, 475, 117 S.Ct. 2130.)
The Glickman majority went on to conclude that Marketing Order No. 917 did not even implicate, still less violate, the First Amendment right of Gerawan and the rest to freedom of speech by compelling funding of generic advertising. (See Glickman v. Wileman Brothers & Elliott, Inc., supra, 521 U.S. at pp. 468, 473-474, fn. 16, & 476, 117 S.Ct. 2130.) They considered the marketing order in question as merely a "species of economic regulation," no more and no less, without any effect on the right at issue. (Id. at p. 477, 117 S.Ct. 2130.) They "presume[d]" that Gerawan and the rest "agree[d] with the central message of the speech that [was] generated by the generic [advertising]." (Id. at p. 470, 117 S.Ct. 2130.) They did not measure the marketing order against the right, but rather purported to "distinguish" the former out of the latter's scope. (Id. at p. 469, 117 S.Ct. 2130.)
Specifically, the Glickman majority said that Marketing Order No. 917 did not "impose[]" any "restraint" on any person's freedom of speech (Glickman v. Wileman Brothers & Elliott, Inc., supra, 521 U.S. at p. 469, 117 S.Ct. 2130): The fact that the order imposed "assessments for generic advertising," which might "indirectly lead to a reduction in" one's "individual advertising budget[,] does not itself amount to a restriction on speech." (Id. at p. 470, 117 S.Ct. 2130.)
The Glickman majority then said that Marketing Order No. 917 did not "compel any person to engage in any .. . speech" (Glickman v. Wileman Brothers & Elliott, Inc., supra, 521 U.S. at p. 469, 117 S.Ct. 2130): It did not "require" anyone "to speak" himself or even "to be publicly identified or associated with another's message." (Id at p. 471, 117 S.Ct. 2130.)
The Glickman majority said, finally and crucially, that Marketing Order No. 917 did not "compel" any person to fund any "political or ideological" speech (Glickman v. Wileman Brothers & Elliott, Inc., supra, 521 U.S. at pp. 469-470, 117 S.Ct. 2130): The generic advertising amounted only to commercial speech, "encouraging consumers to buy" the fruit indicated (id. at p. 472, 117 S.Ct. 2130); it could not be "said to engender any crisis of conscience" in political or ideological matters (id at p. 472, 117 S.Ct. 2130) or to "conflict with" anyone's "`freedom of belief'" in such areas (id. at p. 471, 117 S.Ct. 2130); any objection against the generic advertising as political or ideological in character, for instance, as "promot[ing] ... `socialistic programs'" (id. at p. 467, fn. 10, 117 S.Ct. 2130), was "trivial" (id. at p. 471, 117 S.Ct. 2130). Indeed, decisions such as Abood and its progeny, including Keller, stand for the proposition that a person who has lawfully been compelled to associate with others may be compelled to fund even political or ideological speech, without suffering a violation of his First Amendment right to freedom of speech, if the political or ideological *494 speech in question is "`germane to the purposes'" that "`justified'" the "`compelled association'" in the first place. (Glickman v. Wileman Brothers & Elliott, Inc., supra, 521 U.S. at pp. 472-473, 117 S.Ct. 2130.) The "test" of Abood and Keller would "clearly" be "satisfied in this case because ... the generic advertising ... is unquestionably germane to the purposes of the marketing order[] ...." (Glickman v. Wileman Brothers & Elliott, Inc., supra, 521 U.S. at p. 473, 117 S.Ct. 2130.)
Speaking through the principal dissenting opinion, Justice Souter would have struck down Marketing Order No. 917 as violative of the First Amendment right of Gerawan and the rest to freedom of speech.
Justice Souter concluded that Marketing Order No. 917 did indeed implicate the First Amendment right of Gerawan and the rest to freedom of speech with respect to commercial speech. (Glickman v. Wileman Brothers & Elliott, Inc., supra, 521 U.S. at pp. 478-491, 117 S.Ct. 2130 (dis. opn. of Souter, J.).)
Justice Souter found "doubtful" the Glickman majority's "assumption" that Gerawan and the rest did not "disagree" with the generic advertising. (Glickman v. Wileman Brothers & Elliott, Inc., supra, 521 U.S. at p. 488, 117 S.Ct. 2130 (dis. opn. of Souter, J.).) He then found any such lack of disagreement immaterial: What mattered was what speech a speaker chooses to fund or not to fund, not why he chooses to do so or not. (Id. at pp. 488-489, 117 S.Ct. 2130 (dis. opn. of Souter, J.).)
As for the Glickman majority's crucial assertion that Marketing Order No. 917 did not "compel" any person to fund any "political or ideological" speech (Glickman v. Wileman Brothers & Elliott, Inc., supra, 521 U.S. at pp. 469-470, 117 S.Ct. 2130), Justice Souter observed that the First Amendment's right to freedom of speech does not bar compelling a speaker to fund speech that he otherwise would not fund only when such speech would be political or ideological in characteronly when, in other words, it would "engender" in him a "crisis of conscience" (Glickman v. Wileman Brothers & Elliott, Inc., supra, 521 U.S. at p. 472, 117 S.Ct. 2130) or "conflict with" his "`freedom of belief'" in such areas (id. at p. 471, 117 S.Ct. 2130): Prior decisions such as Abood and its progeny including Keller happened to arise in the context of political or ideological speecha mere "fortuity"but did not bar their application to commercial speech. (Glickman v. Wileman Brothers & Elliott, Inc., supra, 521 U.S. at p. 488, 117 S.Ct. 2130 (dis. opn. of Souter, J.).) The fact that, under such decisions, a person who has lawfully been compelled to associate with others may be compelled to fund even political or ideological speech without suffering a violation of the right in question does not mean that he can be so compelled without experiencing any implication of the right at all. (Id at pp. 483-486, 117 S.Ct. 2130 (dis. opn. of Souter, J.).)
Justice Souter then concluded that Marketing Order No. 917 was subject to examination under the Central Hudson test, which considers whether a "regulation" restricting commercial speech (1) serves a "governmental interest" that is "substantial," (2) "directly advances" such interest, and (3) is "not more extensive than ... necessary" (Central Hudson Gas & Elec. v. Public Serv. Comm'n, supra, 447 U.S. at p. 566, 100 S.Ct. 2343). (Glickman v. Wileman Brothers & Elliott, Inc., supra, 521 U.S. at pp. 491-192, 117 S.Ct. 2130 (dis. opn. of Souter, J.).)
Justice Souter finally concluded that Marketing Order No. 917 did not survive muster under any of the three prongs of the Central Hudson test: The marketing order (1) did not serve a governmental interest that was "substantial," as reflected in the fact that the AMAA's authorization of provisions therein for advertising, whether generic or otherwise, had been relatively late and spotty; (2) did *495 not "directly advance[ ]" any such interest; and (3) was not "narrowly tailored" in the service thereof. (Glickman v. Wileman Brothers & Elliott, Inc., supra, 521 U.S. at p. 491, 117 S.Ct. 2130 (dis. opn of Souter, J.); see id. at pp. 492-504, 117 S.Ct. 2130 (dis. opn. of Souter, J.).)[8]
Speaking through his own dissenting opinion, Justice Thomas would also have struck down Marketing Order No. 917 as violative of the First Amendment right of Gerawan and the rest to freedom of speech. Unlike Justice Souter, he rejected the Central Hudson test in and of itself as too "lenient." (Glickman v. Wileman Brothers & Elliott, Inc., supra, 521 U.S. at p. 504, 117 S.Ct. 2130 (dis. opn. of Thomas, J.) )
In sum, the Glickman majority's analysis results from, and results in, the proposition that the First Amendment's right to freedom of speech does not protect commercial speech against compelled funding. To quote Justice Souter, who was not challenged on the point, the Glickman majority simply found "no First Amendment right to be free of coerced subsidization of commercial speech" whatsoever. (Glickman v. Wileman Brothers & Elliott, Inc., supra, 521 U.S. at p. 477, 117 S.Ct. 2130 (dis. opn. of Souter, J.).)
The soundness of the Glickman majority's analysis is open to serious question.
In its own terms, the Glickman majority's analysis lacks persuasiveness. Its legal component is driven not so much by principled reasoning as by ad hoc distinguishing. Its factual component is hardly better. For example, the majority's express "presum[ption]" that Gerawan and the rest "agree[d] with the central message of the speech that [was] generated by the generic [advertising]" (Glickman v. Wileman Brothers & Elliott, Inc., supra, 521 U.S. at p. 470, 117 S.Ct. 2130), to the effect that "`California Summer Fruits' are wholesome, delicious, and attractive to discerning shoppers" (id. at p. 462, 117 S.Ct. 2130), and their implied conclusion that such a "central message" (id. at p. 470, 117 S.Ct. 2130) is unexceptionable, appear to betray a certain lack of sophistication. To be sure, history has witnessed benefits accruing to producers of agricultural commodities from generic advertising. But it has also witnessed burdens imposed on them as a result. By way of illustration, when some producers, like Gerawan, develop and use brands in marketing their goods, and others do not, the former may find themselves disadvantaged by generic advertising in their competition against the latter. Generic advertising may portray goods as "indistinctive" in spite of brand, and may thereby "minimize[] consumer desire to distinguish" inter se. (Comment, The Effect of Glickman v. Wileman Brothers & Elliott, Inc. on Congeneric Commodities: A Narrow Focus on a Broad Rule (1999) 9 San Joaquin Agr.L.Rev. 95, 113.) Even when no producers develop or use brands in marketing their goods, some may find themselves disadvantaged by generic advertising in their competition against others. Generic advertising can be manipulated to serve the interests of some producers rather than others, as by allowing some to develop a kind of brand by means of funds assessed from all and then use it for their *496 own exclusive benefit. Thus, in any given case, a producer who objects to generic advertising may not be attempting to ride free on the funds of othersa familiar chargebut may merely be making an effort to prevent others from hijacking his own funds as they drive to their own destination.
In addition, with virtual unanimity, commentators have subjected the Glickman majority's analysis to extensive criticism. (See 2 Smolla & Nimmer, Freedom of Speech (1999) § 20:45, pp. 20-106 to 20-115; Fried, Perfect Freedom, Perfect Justice (1998) 78 B.U.L.Rev. 717, 743, fn. 84; Casarez, Don't Tell Me What to Say: Compelled Commercial Speech and the First Amendment (1998) 63 Mo.L.Rev. 929, 954-965; Comment, Glickman v. Wileman Brothers & Elliott, Inc.: Don't Put Words in [M]y Mouth (1999) 33 New Eng.L.Rev. 989, 1004-1028; Comment, The Effect of Glickman v. Wileman Brothers & Elliott, Inc. on Congeneric Commodities: A Narrow Focus on a Broad Rule, supra, 9 San Joaquin Agr.L.Rev. at pp. 100-107; Recent DevelopmentsFree Speech and Freer Speech: Glickman v. Wileman Brothers & Elliott, Inc., 521 U.S. 457, 117 S.Ct. 2130, 138 L.Ed.2d 585 (1997) (1998) 21 Harv.J.L. & Pub. Pol'y 623, 624-637; Case Note, Constitutional Law Forced Advertising: Free Speech or Not Even? Glickman v. Wileman Brothers & Elliott, Inc., 521 U.S. at p. 482, fn. 2, 117 S.Ct. 2130, 138 L.Ed.2d 585 (1997) (1998) 33 Land & Wat.L.Rev. 779, 784-795; Note, Glickman v. Wileman Brothers & Elliot[t], Inc.: Has the Supreme Court Lost Its Way? (1998) 27 Stetson L.Rev. 1461, 1476-1494; The Supreme Court, 1996 TermLeading Cases (1997) 111 Harv.L.Rev. 197, 319-329; but see Kamenshine, Reflections on Coerced Expression (1999) 34 Land & Wat.L.Rev. 101, 108-110; Note, The Demise of a Workable Commercial Speech Doctrine: Dangers of Extending First Amendment Protection to Commercial Disclosure Requirements (1997) 76 Tex. L.Rev. 471, 501-502.)
For example, according to Professor Rodney Smolla, a noted scholar of the First Amendment, "[t]he Glickman decision was an unfortunate blip.... Justice Souter surely had the better of the argument. One can only hope that Glickman will someday prove to be an errant aberration, [and be] overruled .... The Court in Glickman appeared unable to get past conceptualizing the case before it as essentially one of agricultural and economic policy, and for that reason failed to apply conscientiously the First Amendment principles that ought to have resulted in" Marketing Order No. 917 "being struck down." (2 Smolla & Nimmer, Freedom of Speech, supra, § 20:45, pp. 20-114 to 20-115.)
For his part, Charles Fried, who was formerly Solicitor General of the United States and is presently an Associate Justice of the Supreme Judicial Court of the Commonwealth of Massachusetts, has stated that "the Court in Glickman ... did not see what Justice Souter pointed out in dissent, that the convergent analogies of prior cases "almost compelled a decision against the aspect of Marketing Order No. 917 that "the court upheld." (Fried, Perfect Freedom, Perfect Justice, supra, 78 B.U.L.Rev. at p. 743, fn. 84.)
In the view of Professor Nicole Casarez, "Glickman constitutes a serious departure from traditional commercial speech and compelled speech analysis. The majority's contextual approach resulted in a house-of-cards opinion based on a faulty premise: that compelled commercial speech does not raise a First Amendment issue .... This premise overlooks three settled First Amendment principles: first, that compelled speech is just as constitutionally suspect as restricted speech; second, that paying for speech is constitutionally equivalent to speaking; and third, that commercial speech falls within the scope of the First Amendment." (Casarez, Don't Tell Me What to Say: Compelled Commercial Speech and the First Amendment, supra, 63 Mo.L.Rev. at p. 960.)
*497 All that we have said above, however, must be qualified by this: Although the soundness of the Glickman majority's analysis is open to serious question, its authority is not. We shall therefore apply it here as we must.
In its amended complaint, Gerawan alleges facts, liberally construed, to the effect that it produces and handles plums; plums constitute a lawful product; it has developed, and uses, a brand for marketing purposes; it engages in commercial speech about its own branded plums through advertising; its message is not false or misleading; it is nevertheless compelled by the California Plum Marketing Program to fund commercial speech in the form of generic advertising about plums as a commodity against its will; and the compulsion of funding reduces the amount of money available for its own advertising.
Under the Glickman majority's analysis, Gerawan's factual allegations are not sufficient even to implicate its First Amendment right to freedom of speech against the California Plum Marketing Program for compelling funding of generic advertising.
Gerawan does not allege facts that would establish that the California Plum Marketing Program "imposes" any "restraint" on its freedom of speech. (Glickman v. Wileman Brothers & Elliott, Inc., supra, 521 U.S. at p. 469, 117 S.Ct. 2130.) That the compulsion of funding of generic advertising for plums as a commodity may, as it alleges, reduce the amount of money available for its own advertising of its own branded plums is not enough. The Glickman majority stated plainly that any such "reduction ... does not ... amount to a restriction on speech." (Id. at p. 470, 117 S.Ct. 2130.) Gerawan no longer resists.
Neither does Gerawan allege facts that would establish that the California Plum Marketing Program "compel[s]" it "to engage in any ... speech." (Glickman v. Wileman Brothers & Elliott, Inc., supra, 521 U.S. at p. 469, 117 S.Ct. 2130.) Under the facts alleged, the California Plum Marketing Program does not "require" Gerawan "to speak" itself. (Id. at p. 471, 117 S.Ct. 2130.) Gerawan does not assert that it does. Under the same facts, the California Plum Marketing Program does not "require" Gerawan "to be publicly identified or associated with" the California Plum Marketing Board's "message." (Ibid.) Here, Gerawan does indeed assert that it does. It assumes that "[m]ost consumers assume" that the board speaks on its behalf. Assumption upon assumption, however, does not amount to the allegation of a fact.
Lastly, Gerawan does not allege facts that would establish that the California Plum Marketing Program "compel[s]" it to fund any "political or ideological" speech. (Glickman v. Wileman Brothers & Elliott, Inc., supra, 521 U.S. at pp. 469-470, 117 S.Ct. 2130.) It alleges that it "disagrees" with, and indeed "abhors," the generic advertising, otherwise undescribed, on both political and ideological grounds, as "socialistic" and "collectivist," and also on commercial grounds, as "grouping all ... plums as though they are the same" and as "embarrassingly silly, idiotic and/or totally ineffective." It objects to the generic advertising, but does not even allege facts as to its specific content. Any aspects that "group[ ] all ... plums as though they are the same," or that are "embarrassingly silly, idiotic and/or totally ineffective," are commercial in character. Any aspects, however, that are "socialistic" and "collectivist" are indeed political or ideological. But they are not enough. The Glickman majority stated plainly that any objection against generic advertising as "`"promoting] ... socialistic"'"or collectivist" `"programs"'" (Glickman v. Wileman Brothers & Elliott, Inc., supra, 521 U.S. at p. 467, fn. 10, 117 S.Ct. 2130) has to be dismissed as "trivial" (id. at p. 471, 117 S.Ct. 2130).
Against our conclusion, Gerawan argues that the Glickman majority's analysis is, in fact, inapplicable. To no avail.
*498 Gerawan initially attempts to distinguish the CMA, under which the California Plum Marketing Program was issued, from the AMAA, under which Marketing Order No. 917 was issued.
Although plainly not identical, the CMA and the AMAA, so far as the Glickman majority's analysis is concerned, are not materially different. Since 1937, the AMAA's underlying policies have included the establishing and maintaining of orderly marketing conditions for agricultural commodities in order to raise and support prices for their producers. The same is true of the CMA's underlying policies. Since 1937, the AMAA has authorized marketing orders as regulations governing marketing matters for the producers and handlers of agricultural commodities. The same is true of the CMA. The AMAA's authorization of provisions in marketing orders for advertising, whether generic or otherwise, has been relatively late and spotty. The same is not true, however, of the CMA, whose authorization of provisions in marketing orders for generic advertising has been broad and ab initio. This fact marks a differencebut not one that is material or, apparently, even favorable to Gerawan's position.[9]
Gerawan then attempts to distinguish the California Plum Marketing Program itself from Marketing Order No. 917.
Gerawan quotes the Glickman majority's statement: Marketing Order No. 917 was a "detailed" "regulatory scheme" that had "displaced many aspects of independent business activity that characterize other portions of the economy in which competition is fully protected by the antitrust laws," and accordingly "compelled" Gerawan and the rest "to fund the generic advertising at issue ... as a part of a broader collective enterprise in which their freedom to act independently" was "already constrained." (Glickman v. Wileman Brothers & Elliott, Inc., supra, 521 U.S. at p. 469, 117 S.Ct. 2130.) Gerawan then maintains that the California Plum Marketing Program is not such a "detailed" "regulatory scheme." (Ibid.)
Although plainly not identical, the California Plum Marketing Program and Marketing Order No. 917, so far as the Glickman majority's analysis is concerned, are not materially different. Marketing Order No. 917, among other things, provided for the undertaking, by the Plum Commodity Committee, of research and development projects, including advertising, and set out specific regulations regarding both fruit containers and packs and also fruit grades and sizes. The California Plum Marketing Program provides for the undertaking, by the California Plum Marketing Board, of research; advertising, specifically generic advertising, along with sales promotion and market development; and the institution and implementation of quality standards and inspections. It appears that a federal marketing order under the AMAA might have regulated more broadly and deeply than a state marketing order under the CMA. But Marketing Order No. 917 did not in fact regulate so much more broadly and deeply than the California Plum Marketing Program.
At bottom, Gerawan would have us characterize Marketing Order No. 917 as a regulation of economic activity with an incidental effect on speech and the California Plum Marketing Program as a regulation *499 of speech with an incidental effect on economic activity. We cannot do so. Contrary to Gerawan's assertion, the fact that the California Plum Marketing Program earmarks 55 percent of the funds assessed from producers for generic advertising along with sales promotion and market development, with only 35 percent for quality standards and inspections and only 10 percent for research, does not cause it to "stand[] alone ... as a regulation of speech."[10]

D
The second question that we address is, Does the California Plum Marketing Program, issued by the California Secretary of Food and Agriculture pursuant to the CMA, implicate Gerawan's right to freedom of speech under the free speech clause of article I of the California Constitution by compelling funding of generic advertising?
The answer that we give is, Yes.
At the threshold, we note under article I's free speech clause what we noted under the First Amendment's. Although a corporation, Gerawan may at least be deemed to possess an article I right to freedom of speech, whether or not it does so strictly speaking. (People v. American Automobile Ins. Co., supra, 132 Cal.App.2d at pp. 322, 328, 282 P.2d 559 [semble].) The interests served by its commercial speech about its plums, as we have explained, extend beyond itself to those of its audience of consumers and further to those of society in general. (See Jacoby v. State Bar, supra, 19 Cal.3d at pp. 363, fn. 2, & 375-376, 138 Cal.Rptr. 77, 562 P.2d 1326.)
As stated, article I's right to freedom of speech protects commercial speech, at least in the form of truthful and nonmisleading messages about lawful products and services. It is implicated in speaking itself. It may also be implicated in the use of money.
We shall assume that, with the justification of consumer protection, article I's right to freedom of speech allows compelling one who engages in commercial speech to say through advertising what he otherwise would not say, even about a lawful product or service, in order to render his message truthful and not misleading.
We shall also assume that, with the justification of consumer protection, article I's right to freedom of speech allows compelling one who engages in commercial speech to fund speech in the form of advertising that he would otherwise not, even about a lawful product or service, in order to render his message truthful and not misleading.
*500 Even with such an assumption, article I's right to freedom of speech, without more, would not allow compelling one who engages in commercial speech to say through advertising what he otherwise would not say, when his message is about a lawful product or service and is not otherwise false or misleading.
Similarly, even with such an assumption, article I's right to freedom of speech, without more, would not allow compelling one who engages in commercial speech to fund speech in the form of advertising that he would otherwise not, when his message is about a lawful product or service and is not otherwise false or misleading.
In its amended complaint, by way of restatement, Gerawan alleges facts, liberally construed, to the effect that it produces and handles plums; plums constitute a lawful product; it has developed, and uses, a brand for marketing purposes; it engages in commercial speech about its own branded plums through advertising; its message is not false or misleading; it is nevertheless compelled by the California Plum Marketing Program to fund commercial speech in the form of generic advertising about plums as a commodity against its will; and the compulsion of funding reduces the amount of money available for its own advertising.
Under the law as set forth above, Gerawan's factual allegations are sufficient at least to implicate its article I right to freedom of speech against the California Plum Marketing Program for compelling funding of generic advertising. Gerawan's commercial speech about its own branded plums through advertising concerns a lawful product, and is not itself false or misleading. Yet, the California Plum Marketing Program compels it to fund, against its will, commercial speech in the form of generic advertising about plums as a commoditygeneric advertising that is intended not to prevent or correct any otherwise false or misleading message in the interest of consumer protection, but solely to develop markets and promote sales in the interest of producer welfare.
Against our conclusion, the Secretary of Food and Agriculture argues, in reliance on People v. Teresinski (1982) 30 Cal.3d 822, 180 Cal.Rptr. 617, 640 P.2d 753 (hereafter sometimes Teresinski ), that there are "no reasons ... to justify rejecting" the Glickman majority's construction of the First Amendment's free speech clause as our construction of article I's. (People v. Teresinski supra, 30 Cal.3d at p. 836, 180 Cal.Rptr. 617, 640 P.2d 753.)
In Teresinski the presence of all four of the following facts counseled against rejection of a decision of the United States Supreme Court there considered: First, "nothing in the language or history of the California" constitutional provision in question "suggest[ed] that the issue before us should be resolved differently than under" the analogous federal constitutional "provision". (People v. Teresinski supra, 30 Cal.3d at p. 836, 180 Cal.Rptr. 617, 640 P.2d 753.) Second, the decision in question "did not overrule past precedent or limit previously established rights under" the United States Constitution. (People v. Teresinski supra, 30 Cal.3d at p. 836, 180 Cal.Rptr. 617, 640 P.2d 753.) Third the decision "was unanimous, and ha[d] not inspired extensive criticism." (Id. at pp. 836-837, 180 Cal.Rptr. 617, 640 P.2d 753.) Fourth, the decision, "if followed by the courts of this state, would not overturn established California doctrine affording greater rights" in the particular area. (Id. at p. 837, 180 Cal.Rptr. 617, 640 P.2d 753.)
Here, by contrast, the absence of at least two of these four facts counsels in favor of rejection of the Glickman majority's analysis.
As for the fourth fact, counting from last to first, we acknowledge that the Glickman majority's analysis, "if followed by the courts of this state, would not overturn established California doctrine affording greater rights" in the area of commercial speech under article I's free speech clause. (People v. Teresinski supra, 30 Cal.3d at *501 p. 837, 180 Cal.Rptr. 617, 640 P.2d 753.) Such a result, however, is attributable solely to the fact that the precise issue here is one of first impression.
As for the third fact, however, we must observe that the Glickman majority's analysis was far from "unanimous" (People v. Teresinski supra, 30 Cal.3d at p. 836, 180 Cal.Rptr. 617, 640 P.2d 753): It garnered the support of only five of the court's nine members, and provoked two of them to write dissenting opinions. We must also observe that the Glickman majority's analysis has in fact "inspired extensive criticism" (People v. Teresinski supra, 30 Cal.3d at pp. 836-837, 180 Cal.Rptr. 617, 640 P.2d 753): The various treatises, articles, comments, notes, and case notes cited above stand as proof.
As for the second fact, we concede that, strictly speaking, the Glickman majority's analysis "did not overrule past precedent or limit previously established rights under" the First Amendment's free speech clause. (People v. Teresinski supra, 30 Cal.3d at p. 836, 180 Cal.Rptr. 617, 640 P.2d 753.) Such a result, however, is attributable solely to the fact that the precise issue there was one of first impression. All the same, the Glickman majority's analysis did indeed do violence to the law that it took into its hands. Professor Smolla: "The Court in Glickman ... failed to apply conscientiously the First Amendment principles that ought to have resulted in" Marketing Order No. 917 "being struck down." (2 Smolla & Nimmer, Freedom of Speech, supra, § 20:45, pp. 20-114 to 20-115.) Former Solicitor General and now Justice Fried: "[T]he Court in Glickman ... did not see what Justice Souter pointed out in dissent, that the convergent analogies of prior cases "almost compelled a decision against the aspect of Marketing Order No. 917 that "the court upheld." (Fried, Perfect Freedom, Perfect Justice, supra, 78 B.U.L.Rev. at p. 743, fn. 84.) Professor Casarez: "[O]verlook[ing] ... settled First Amendment principles," "Glickman constitutes a serious departure from traditional commercial speech and compelled speech analysis." (Casarez, Don't Tell Me What to Say: Compelled Commercial Speech and the First Amendment, supra, 63 Mo.L.Rev. at p. 960.) As for the first fact, we cannot agree that "nothing in the language or history of article I's free speech clause "suggests that the issue before us should be resolved differently than under" the First Amendment's as construed by the Glickman majority. (People v. Teresinski supra, 30 Cal.3d at p. 836, 180 Cal.Rptr. 617, 640 P.2d 753.) Indeed, as we have shown, practically everything in such language and history mandates a different resolution.
Focusing on language more than history, the Secretary of Food and Agriculture claims that, for present purposes, article I's free speech clause is not materially different from the First Amendment's.
The secretary's point has been anticipated by our analysis above, which sets out the specific language of article I's free speech clause in its precise setting and also its broad context in the world at large, and must yield to its force.
The secretary nevertheless attempts to make article I's free speech clause similar to the First Amendment's, thus: The first sentence of article I's free speech clause "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right" (Cal.Const., art. I, § 2, subd. (a))is "not implicated in this case" because it assertedly grants only a right to freedom of speech, most narrowly defined, and then only against prior restraint. The second sentence of article I's free speech clause"A law may not restrain or abridge liberty of speech or press" (Cal. Const., art. I, § 2, subd. (a))is indeed implicated, and it is equivalent to the First Amendment's free speech clause.
*502 The secretary's attempt to make article I's free speech clause similar to the First Amendment's collapses onto itself.
On its face, the secretary's attempt is essentially an application of brute force. It simply removes what is unique to article I's free speech clause vis-à-vis the First Amendment's, and keeps what is common. It is different in degree, but not in kind, from making over section 5 of article I of the California Constitution, which states that a "standing army may not be maintained in peacetime," into clause 12 of section 8 of article I of the United States Constitution, which implies that such an army may indeed be maintained, through the simple expedient of deleting the adverbial particle "not."
Furthermore, in its substance, the secretary's attempt proves unpersuasive. It appears to be rooted in the assertion, referred to above, that article I's free speech clause grants only a right to freedom of speech, most narrowly defined, and then only against prior restraint.
We must, however, reject any suggestion by the secretary that article I's free speech clause cannot be implicated in the use of money, but is implicated solely in speaking itself. As stated, even if money is not itself speech, it nevertheless enables speech.
We must also reject any suggestion by the secretary that article I's free speech clause does not grant a right to refrain from speaking at all as well as a right to speak freely. Again, speech results from what a speaker chooses not to say in addition to what he chooses to say. The Secretary appears to argue, syllogistically, as follows: A right that cannot be "abuse[d]" does not exist (Cal. Const., art. I, § 2, subd. (a)); the right to refrain from speaking cannot be abused; therefore, the right to refrain from speaking does not exist. The conclusion does not follow because the minor premise, at least, is unsound. So far as commercial speech is concerned, and on the assumption that article I's right to freedom of speech does not protect commercial speech in the form of false or misleading messages about even lawful products or services,[11] the right not to speak can surely be abused, and is in fact abused, whenever the speaker fails to speak and thereby renders his message false or misleading. (Cf. Griset v. Fair Political Practices Com., supra, 8 Cal.4th at p. 866, fn. 5, 35 Cal.Rptr.2d 659, 884 P.2d 116 [implying, in dictum, that failure on the part of a political candidate to identity himself in a mass mailing may amount to abuse of the right not to speak].)
We must similarly reject any suggestion by the Secretary that article I's free speech clause does not grant a right to refrain from funding speech altogether as well as a right to fund speech meaningfully. Again, speech results, through money's enabling, from what speech a speaker chooses not to fund in addition to what speech he chooses to fund. The Secretary apparently makes the same syllogistic argument as described above, with the same result.
In addition, we must reject any suggestion by the Secretary that article I's free speech clause grants a right to freedom of speech only against prior restraint. True, it does indeed grant a right against prior restraint.[12] But without any limitation thereto. Certainly, that article I's free speech clause grants a right to freedom of speech against prior restraint does not preclude a right against what we may call "subsequent punishment." Indeed, it effectively grants a right against subsequent punishment by effectively conferring immunity, save only for "abuse" (Cal. Const., art. I, § 2, subd. (a)). Moreover, *503 a right against prior restraint could prove empty without a right against subsequent punishment, inasmuch as subsequent punishment might cause the speaker to impose a "prior restraint," as it were, on himself, totally apart from even the threat of imposition of any prior restraint, properly so called, by another. Likewise, that article Fs free speech clause grants a right to freedom of speech against prior restraint does not preclude a right against what we may call "prior compulsion." One does not speak freely when one is restrained from speaking. But neither does one speak freely when one is compelled to speak. Perhaps restraint has figured historically as a more familiar evil. But compulsion does not present itself analytically as a less pernicious one.
For all of these reasons, we must, and do, reject the Glickman majority's construction of the First Amendment's free speech clause as our construction of article I's. As stated, the Glickman majority's analysis results from, and results in, the proposition that the First Amendment's right to freedom of speech does not protect commercial speech against compelled funding. Any such proposition is simply untenable with respect to article I's. The Glickman majority found "no ... right" whatsoever under the First Amendment "to be free of coerced subsidization of commercial speech." (Glickman v. Wileman Brothers & Elliott, Inc., supra, 521 U.S. at p. 477, 117 S.Ct. 2130 (dis. opn. of Souter, J.).) We cannot so find under article I.
With that said, we must in fairness own to the force of a sentiment that appears to inform the Glickman majority's analysis. De minimis non curat lex is a maxim of ancient origin, "old" even in the infancy of the nation. (Ware v. Hylton (1796) 3 U.S. (3 Dall.) 199, 268, 1 L.Ed. 568 (opn. of Iredell, J.).) It seems applicable to the First Amendment's free speech clause. (See Ellis v. Railway Clerks (1984) 466 U.S. 435, 456, 104 S.Ct. 1883, 80 L.Ed.2d 428; Lehnert v. Ferris Faculty Assn., supra, 500 U.S. at p. 559, 111 S.Ct. 1950 (cone. & dis. opn. of Scalia, J.) [characterizing Ellis as recognizing a "de minimis exception"]; see generally Konigsberg v. State Bar, supra, 366 U.S. at pp. 50-51, 81 S.Ct. 997.) In our view, it seems applicable as well to article I's. Under its operation, we might conclude that, in a given case, compelling funding of commercial speech, including generic advertising, does not implicate any right to freedom of speech under article I if the funding compelled and/or the commercial speech resulting therefrom are de minimis. In this case, the facts alleged are to the effect that the California Plum Marketing Program is devoted largely to commercial speech in the form of generic advertising and to compelling funding therefor, earmarking 55 percent of such funding to the underlying activity; it compels Gerawan itself to fund commercial speech in the form of generic advertising in excess of $80,000 per year; and it then engages in such speech in such form in excess of such amount from Gerawan's money alone. Under facts like those alleged herewe know not what facts may one day be provedwe cannot conclude that compelling funding of commercial speech, including generic advertising, does not implicate any right to freedom of speech under article I.[13]

IV
We turn now to the decision of the Court of Appeal, which affirmed the judgment *504 of the superior court on its order granting, without leave to amend, the motion for judgment on the pleadings submitted by the California Secretary of Food and Agriculture on the ground that Gerawan's amended complaint did not allege facts sufficient to constitute a cause of action.
At the threshold, we believe that the Court of Appeal was right to subject the superior court's order granting the motion for judgment on the pleadings, as it apparently did, to independent review. Such a ruling is so scrutinized. (Smiley v. Citibank, supra, 11 Cal.4th at p. 146, 44 Cal.Rptr.2d 441, 900 P.2d 690 [common law motion]; see Schabarum v. California Legislature (1998) 60 Cal.App.4th 1205, 1216-1217, 70 Cal.Rptr.2d 745 [statutory motion].) It resolves a mixed question of law and fact that is predominantly one of law, viz., whether or not the factual allegations that the plaintiff makes are sufficient to constitute a cause of action. (Smiley v. Citibank, supra, 11 Cal.4th at p. 145, 44 Cal.Rptr.2d 441, 900 P.2d 690 [common law motion].) The resolution of a question of this sort calls for examination de novo. (Id. at p. 146, 44 Cal.Rptr.2d 441, 900 P.2d 690 [same].)
On the merits, however, we believe that the Court of Appeal was wrong to sustain the superior court's order granting the motion for judgment on the pleadings.
A trial court's determination of a motion for judgment on the pleadings accepts as true the factual allegations that the plaintiff makes. (Smiley v. Citibank, supra, 11 Cal.4th at p. 146, 44 Cal.Rptr.2d 441, 900 P.2d 690 [common law motion]; see Inter-Modal Rail Employees Assn. v. Burlington Northern & Santa Fe Ry. Co. (1999) 73 Cal.App.4th 918, 924, 87 Cal. Rptr.2d 60 [statutory motion].) In addition, it gives them a liberal construction. (See American Airlines, Inc. v. County of San Mateo (1996) 12 Cal.4th 1110,1118, 51 Cal.Rptr.2d 251, 912 P.2d 1198 [without specification to common law or statutory motion]; Inter-Modal Rail Employees Assn. v. Burlington Northern & Santa Fe Ry. Co., supra, 73 Cal.App.4th at p. 924, 87 Cal.Rptr.2d 60 [statutory motion].)
An appellate court's consideration of the ensuing determination by the trial court involves the same acceptance and liberal construction of the factual allegations in question. (American Airlines, Inc. v. County of San Mateo, supra, 12 Cal.4th at p. 1118, 51 Cal.Rptr.2d 251, 912 P.2d 1198 [without specification to common law or statutory motion]; Inter-Modal Rail Employees Assn. v. Burlington Northern & Santa Fe Ry. Co., supra, 73 Cal.App.4th at p. 924, 87 Cal.Rptr.2d 60 [statutory motion].)
The Court of Appeal sustained the superior court's order granting the motion for judgment on the pleadings because it concluded that the California Plum Marketing Program does not implicate Gerawan's right to freedom of speech under either the First Amendment's free speech clause or article I's.
We agree with the Court of Appeal in its conclusion that the California Plum Marketing Program does not implicate Gerawan's right to freedom of speech under the First Amendment's free speech clause, as construed by the Glickman majority, by compelling funding of generic advertising. As we have explained, the California Plum Marketing Program, and the CMA pursuant to which it was issued, are not materially different for present purposes from Marketing Order No. 917, or from the AMAA pursuant to which it was issued. Marketing Order No. 917 was sustained by the Glickman majority. The California Plum Marketing Program must be sustained by us.
But we do not agree with the Court of Appeal in its conclusion that the California Plum Marketing Program does not implicate Gerawan's right to freedom of speech under article I by compelling funding of generic advertising. As we have also explained, article I's free speech *505 clause is indeed materially different for present purposes from the First Amendment's. The Court of Appeal attempted to render article I's free speech clause similar to the First Amendment's by construing article I's free speech clause as it believed other courts had construed the First Amendment's. It construed article I's free speech clause thus under a "so-called `principle of deference,'" which it said operates when a state constitutional provision is "`similar'" in its "`language'" to a federal constitutional provision. (Quoting Raven v. Deukmejian, supra, 52 Cal.3d at p. 353, 276 Cal.Rptr. 326, 801 P.2d 1077.) The "principle" referred to, however, is only "general" and not inexorable; the "deference" indicated merely counsels "voluntary]" respectful consideration and does not "mandate ... blind obedience." (Ibid., italics omitted.) In any event, the language of article I's free speech clause is simply not similar to the First Amendment's. Rather, as shown, it "differs from" it substantially. (Los Angeles Alliance for Survival v. City of Los Angeles, supra, 22 Cal.4th at p. 365, 93 Cal.Rptr.2d 1, 993 P.2d 334; accord, Dailey v. Superior Court, supra, 112 Cal. at p. 97, 44 P. 458.)
With our conclusion that the California Plum Marketing Program does indeed implicate Gerawan's right to freedom of speech under article I, we bring the task before us to an end. The Court of Appeal's conclusion to the contrary was necessary to its judgment. The former cannot stand. The latter must therefore fall.
Our conclusion, however, brings no conclusion to this cause. That the California Plum Marketing Program implicates Gerawan's right to freedom of speech under article I does not mean that it violates such right. But it does indeed raise the question. That question, in turn, raises others, including what test is appropriate for use in determining a violation. And that question, in its turn, raises still others as well, including what protection, precisely, does article I afford commercial speech, at what level, of what kind, and, perhaps "most difficult," subject to what test (Spiritual Psychic Science Church v. City of Azusa, supra, 39 Cal.3d at p. 513, 217 Cal.Rptr. 225, 703 P.2d 1119). To address such questions belongs, in the first instance, to the Court of Appeal on remand. It did not reach beyond the issue whether the California Plum Marketing Program implicates Gerawan's right to freedom of speech under article I when the cause was before it originally. It will have the opportunity, and the obligation, to do so when the cause returns following our judgment.[14]

V
For the reasons stated above, we conclude that we must vacate the judgment of the Court of Appeal, and remand the cause to that court for further proceedings not inconsistent with this opinion.
It is so ordered.
KENNARD, J., WERDEGAR, J., and BROWN, J., concur.
Dissenting Opinion by GEORGE, C.J.
I respectfully dissent.
The generic advertising component of the California Plum Marketing Program challenged in this case is for all relevant purposes identical to the component that has been a part of numerous similar marketing programs that have existed throughout the nation for more than 60 years, compelling all business enterprises in a particular industry to pay their fair share of the cost of generic, nonpolitical, and nonideological advertising of their agricultural products. As the majority recognizes, the challenged program also is for all relevant purposes identical to the generic *506 advertising program that the United States Supreme Court, only three years ago, upheld in Glickman v. Wileman Bros. & Elliott, Inc. (1997) 521 U.S. 457, 117 S.Ct. 2130, 138 L.Ed.2d 585 (Glickman ) against a challenge under the First Amendment of the federal Constitution. Although I agree with the majority that the protection afforded by article I, section 2, subdivision (a) of the California Constitution (hereafter article I, section 2(a) or the free speech provision) is independent of and in some contexts greater than that provided by the federal Constitution under the First Amendment, I believe the majority has failed to demonstrate that the state constitutional provision imposes greater restraint on the state's authority than its federal counterpart in the context presented by this case.
As I shall explain, other jurisdictions whose state constitutions contain free speech provisions similar to California's have interpreted their constitutional provisions as not restricting the respective state's authority to regulate commercial speech any more than does the federal Constitution. In my view, there is no basis, either in the language or the history of California's constitutional provision, that would justify interpreting article I, section 2(a) so as to afford an agricultural producer a greater right under the state Constitution than under the federal Constitution to obtain "free rider" status with respect to such generic advertising, i.e., to permit a producer to obtain the benefits from the generic advertising created under the marketing order without paying its fair share of the cost of such advertising.
Moreover, even if I were to agree with the majority that we should reject the reasoning of Glickman, supra, 521 U.S. 457, 117 S.Ct. 2130, 138 L.Ed.2d 585, and hold that the marketing program here at issue "implicates" (maj. opn., ante, 101 Cal. Rptr.2d at p. 475, 12 P.3d at p. 725) the state constitutional right of free speech under article I, section 2(a), I would not remand this matter to the Court of Appeal to require that court first to determine, and then to apply, the correct standard of review for evaluating the validity of the marketing order's impingement upon plaintiffs state constitutional right to free speech. Instead, I would hold that any impingement is subject to review pursuant to the test set out in Abood v. Detroit Bd. of Ed. (1977) 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (Abood ) and Keller v. State Bar of California (1990) 496 U.S. 1, 110 S.Ct. 2228, 110 L.Ed.2d 1 (Keller ), and further that, under that standard, the challenged plum marketing program does not violate article I, section 2(a).

I.

A.
In Glickman, supra, 521 U.S. 457, 117 S.Ct. 2130, 138 L.Ed.2d 585, the United States Supreme Court, in an opinion authored by Justice Stevens and joined by Justices O'Connor, Kennedy, Ginsburg and Breyer, held that the First Amendment is not implicated by a federal marketing order issued pursuant to the Agricultural Marketing Agreement Act of 1937 (Act of June 3, 1937, ch. 296, 50 Stat. 246 et seq. as amended, codified at 7 U.S.C. § 601 et seq.) that required an agricultural business to contribute to the costs of generic advertising of tree fruits. In reaching its decision, the court in Glickman emphasized the context of the compulsory advertising program, noting that the industry was thoroughly regulated and "collectivized" in numerous respects. The court observed: "[The tree fruits] are marketed pursuant to detailed marketing orders that have displaced many aspects of independent business activity that characterize other portions of the economy in which competition is fully protected by the antitrust laws. The business entities that are compelled to fund the generic advertising at issue in this litigation do so as a part of a broader collective enterprise in which their freedom to act independently is already constrained *507 by the regulatory scheme. It is in this context that we consider whether we should review the assessments used to fund collective advertising, together with other collective activities, under the standard appropriate for review of economic regulation or under a heightened standard appropriate for the review of First Amendment issues." (Glickman, supra, 521 U.S. at p. 469,117 S.Ct. 2130.)[1]
The court in Glickman, supra, 521 U.S. 457, 117 S.Ct. 2130, 138 L.Ed.2d 585, proceeded to explain that "[t]hree characteristics of the regulatory scheme at issue distinguish it from laws that we have found to abridge the freedom of speech protected by the First Amendment." (Id., at p. 469, 117 S.Ct. 2130.)
First, the court observed that fruit producers and handlers are not prevented from promulgating their own advertisements, and hence communicating their own message, to any audience. (Glickman, supra, 521 U.S. 457, 469, 117 S.Ct. 2130.) The court rejected the argument that the "assessments for generic advertising impinge on ... First Amendment rights because they reduce the amount of money that producers have available to conduct their own advertising." (Id., at p. 470, 117 S.Ct. 2130.) The court explained: "This is equally true, however, of assessments to cover employee benefits, inspection fees, or any other activity that is authorized by a marketing order. The First Amendment has never been construed to require heightened scrutiny of any financial burden that has the incidental effect of constraining the size of a firm's advertising budget. The fact that an economic regulation may indirectly lead to a reduction in a handler's individual advertising budget does not itself amount to a restriction on speech." (Ibid.)
Second, the court in Glickman noted that no fruit producer or handler is compelled *508 to engage in any actual or symbolic speech. (Glickman, supra, 521 U.S. 457, 469, 117 S.Ct. 2130.) The court rejected the contrary argument: "Our compelled speech case law ... is clearly inapplicable to the regulatory scheme at issue here. The use of assessments to pay for advertising does not require respondents to repeat an objectionable message out of their own mouths, [citation], require them to use their own property to convey an antagonistic ideological message, [citations], force them to respond to a hostile message when they `would prefer to remain silent,' [citation], or require them to be publicly identified or associated with another's message, [citation]. Respondents are not required themselves to speak, but are merely required to make contributions for advertising. With trivial exceptions on which the court [below] did not rely, none of the generic advertising conveys any message with which respondents disagree. Furthermore, the advertising is attributed not to them, but to the California Tree Fruit Agreement or `California Summer Fruits.'" (Id., at pp. 470-471, 117 S.Ct. 2130, fn. omitted.)
Finally, the court in Glickman observed that the regulatory scheme differed from laws that have been found to implicate free speech rights, because in the case before it the generic commercial advertising did not force any producer or handler to endorse or finance political or ideological views with which he or she disagrees. (Glickman, supra, 521 U.S. 457, 469-470 [117 S.Ct. 2130].) The court acknowledged, however, that "[although this regulatory scheme may not compel speech as recognized by our case law, it does compel financial contributions that are used to fund advertising.... [J]ust as the First Amendment prohibits compelled speech, it prohibitsat least without sufficient justification by the governmentcompelling an individual to `render financial support for others' speech.' [Citation.] However, Abood [, supra, 431 U.S. 209, 97 S.Ct. 1782], and the cases that follow it, did not announce a broad First Amendment right not to be compelled to provide financial support for any organization that conducts expressive activities. Rather, Abood merely recognized a First Amendment interest in not being compelled to contribute to an organization whose expressive activities conflict with one's `freedom of belief.' 431 U.S., at 235 [97 S.Ct. 1782]." (Glickman, supra, 521 U.S. at p. 471, 117 S.Ct. 2130.)[2]
The court in Glickman continued: "[Requiring respondents to pay the assessments cannot be said to engender any crisis of conscience. None of the advertising in this record promotes any particular message other than encouraging consumers to buy California tree fruit.... [¶] Moreover, rather than suggesting that mandatory funding of expressive activities always constitutes compelled speech in violation of the First Amendment, our cases provide affirmative support for the proposition that assessments to fund a lawful collective program may sometimes be used to pay for speech over the objection of some members of the group." (Glickman, *509 supra, 521 U.S. 457, 472-473, 117 S.Ct. 2130.) The high court stressed that "`Abood held that a union could not expend a dissenting individual's dues for ideological activities not "germane" to the purpose for which compelled association was justified: collective bargaining.'" (Id., at p. 473, 117 S.Ct. 2130.) The opinion in Glickman also noted that in Keller, supra, 496 U.S. 1, 110 S.Ct. 2228, 110 L.Ed.2d 1 (a case involving bar association activities), the court had found that "`the compelled association and integrated bar [were] justified by the State's interest in regulating the legal profession and improving the quality of legal services'" and had concluded that "`[t]he State Bar may therefore constitutionally fund activities germane to those goals out of the mandatory dues of all members. It may not, however, in such manner fund activities of an ideological nature which fall outside of those areas of activity.'" (Glickman, supra, 521 U.S. at p. 473, 117 S.Ct. 2130, quoting Keller, supra, 496 U.S. at pp. 13-14, 110 S.Ct. 2228.)[3] The court in Glickman found the Keller test "clearly satisfied" in the case before it, "because (1) the generic advertising of California [tree fruit] is unquestionably germane to the purposes of the marketing orders and, (2) in any event, the assessments are not used to fund ideological activities." (Glickman, supra, 521 U.S. at p. 473, 117 S.Ct. 2130, fn. omitted.)
Summarizing its review of the three distinguishing characteristics discussed above, the court concluded in Glickman: "[N]one of our First Amendment jurisprudence provides any support for the suggestion that the promotional regulations should be scrutinized under a different standard from that applicable to the other anticompetitive features of the marketing orders." (Glickman, supra, 521 U.S. 457, 470, 117 S.Ct. 2130.) Based upon the highly regulated and collectivized context of the compulsory advertising program, and negative findings on the three factors mentioned above, the court in Glickman found the marketing program to be "a species of economic regulation" (id., at p. 477, 117 S.Ct. 2130) outside the reach of the First Amendment, and subject to mere rational basis review.
Despite the majority's criticisms of Glickman (maj. opn., ante, 101 Cal.Rptr.2d at pp. 492-497, 12 P.3d at pp. 740-745), it has failed to demonstrate that the high court was wrong in finding that, in this heavily regulated setting, the First Amendment is not implicated by the compelled funding of generic advertising through a marketing order, and that such an order in this setting is merely "a species of economic regulation." (Glickman, supra, 521 U.S. 457, 477, 117 S.Ct. 2130.)[4]

B.
Before and soon after adoption of the federal Agricultural Marketing Agreement Act of 1937 at issue in Glickman, supra, 521 U.S. 457, 117 S.Ct. 2130, numerous states enacted similar measuresmost of which are in effect today in codified and superseding or amended formproviding, among other things, for assessments on many kinds of agricultural commodities, to fund generic advertising for those commodities. (E.g., 1935 Fla.Laws, chs. 16854-16858; 1937 Idaho Sess.Laws, ch. 252, §§ 1-21; 1939 Mich.Pub.Acts, No. 87, §§ 1-16; 1939 Colo.Sess.Laws, ch. 66, §§ 1-20; 1942 La.Acts, No. 294, §§ 1-10; 1937 Me. Laws, ch. 84, §§ 1-13; 1945 Neb. Laws, ch. 4, §§ 1-12.)[5] California's version *510 the California Marketing Act of 1937, added by Statutes 1937, chapter 404, section 1, page 1329 et seq., codified at Food and Agricultural Code, section 58601 et seq. (CMA or Act)is substantially similar to the other state and federal acts. The ensuing "California Plum Marketing Program" here under review is likewise substantially similar to other marketing programs that have existed for decades throughout the nation.
The California Act, like the federal legislation and that of many other states, creates a highly regulated environment that restricts the freedom of producers and handlers to act independently, for example by setting quality and ripeness standards for the marketing of products. In addition, and pertinent to our present inquiry, the California Actagain like the federal legislation and that of many other states expressly permits issuance of marketing orders for advertising campaigns regarding agricultural commodities grown in California, funded by compelled contributions. (Food & Agr.Code, §§ 58889, 58921.) Like producers and handlers under the federal program at issue in Glickman, and like those operating under other programs that have existed for decades throughout the nation, producers and handlers of California plums have been compelled, through a resulting state-issued marketing order, to fund[6] generic advertising "as a part of a broader collective enterprise." (Glickman, supra, 521 U.S. 457, 469, 117 S.Ct. 2130.)[7]
As the majority acknowledges, the state legislation and the marketing program here at issue are not materially different from the program approved in Glickman. (Maj. opn., ante, 101 Cal.Rptr.2d at pp. 498, 504, 12 P.3d at pp. 745-746, 750-751.) The majority provides a partial description of this regulatory context (maj. opn., ante, at pp. 477-479, 12 P.3d at pp. 726-729), but I believe that it is helpful to emphasize the regulatory scheme in greater detail, and hence quote below extensively from the Court of Appeal majority's decision in this case:
"The point of these [the state and federal marketing] programs is not simply to regulate the market; the point is to preserve the agricultural industry. The laws reflect a long-standing political judgment that `agriculture'unlike bicycle manufacturing or clothing production, for examplecannot be allowed to disappear from the American economy because of untrammeled market forces....[8]
*511 "In this context, it is worth repeating at length the legislative findings that form the basis of the exercise of the police power of the state in the Act: `It is hereby declared that the marketing of commodities in this state in excess of reasonable and normal market demands therefor; disorderly marketing of such commodities; improper preparation for market and lack of uniform grading and classification of commodities; unfair methods of competition in marketing of commodities; and the inability of individual producers to maintain present markets or to develop new or larger markets for California-grown commodities, result in an unreasonable and unnecessary economic waste of the agricultural wealth of this state.' (Food & Agr. Code, § 58651.) The foregoing described the result of unrestrained competition in the marketing of perishable commodities; the Legislature then stated that `[t]hese conditions vitally concern the health, peace, safety and general welfare of the people of this state.' (Food & Agr.Code, § 58652.[9]
"... [T]he California marketing order [here at issue] `insure[s] maturity, grade and accurate size labeling,' in addition to providing mandatory funding of generic advertising.... [I]t is apparent from the foregoing legislative findings that maturity, grade and labeling standards directly displace the ability to compete using the traditional methods of different' ... preparation for market and ... [individualized] grading and classification of agricultural commodities.'... [¶] ... [¶]
"It is rational to control prices as a way to ensure both demand for the product and a supply of the product [citation]; it is rational to control supply to ensure a demand sufficient to return a fair price [citation]; and it is rational to stimulate demand so that the amount produced by suppliers brings a fair price. In each case, the fundamental assumption of unrestrained competitionthat supply and demand together set the price in a free marketis replaced with an assumption that regulatory modification of the marketof supply and/or demandis necessary in the public interest.
"This is the sense in which the [Glickman] majority characterized the generic advertising campaign as not violating free speech protections, but merely as one of a number of available tools imbedded in a comprehensive regulatory program 'that impose[s] restraints on competition that arguably disadvantage particular producers for the benefit of the entire market.' ([Glickman, supra,] 521 U.S. at p. 474 [117 S.Ct. 2130], fn. omitted.) ... [T]he point [of the Glickman majority] is that the advertising tool merely seeks to accomplish the same goals as equally or more invasive tools, such as price, quantity, quality and labeling restrictions; no *512 greater weight should be given to the fact that the advertising tool involves an activity that, in other contexts, is `commercial speech' protected by the First Amendment." (Fns. omitted, italics added.)
It is clear that the present case presents itself in essentially the same heavily regulated context that the majority in Glickman found to be highly pertinent to its inquiry under the free speech clause of the First Amendment.

II.
The Secretary of Food and Agriculture of the State of California argues that although our state Constitution has independent force and we are not bound by the United States Supreme Court's interpretation of corresponding provisions of the federal Constitution, nevertheless, pursuant to People v. Teresinski (1982) 30 Cal.3d 822, 180 Cal.Rptr. 617, 640 P.2d 753 (Teresinski ), we should give Glickman "respectful consideration" and follow it under our own charter "unless persuasive reasons are presented for taking a different course." (Teresinski, supra, 30 Cal.3d at p. 836, 180 Cal.Rptr. 617, 640 P.2d 753.) The majority implicitly concedes that pursuant to Teresinski, unless there are cogent reasons not to follow Glickman's conclusion, we should adopt the high court's approach in construing our own free speech clause, and hold that article I, section 2(a) is not implicated by the generic advertising component of the comprehensive state-mandated commercial marketing program.
The majority discusses the factors that we identified in Teresinski, supra, 30 Cal.3d 822, 836-837, 180 Cal.Rptr. 617, 640 P.2d 753, as relevant to whether we should construe a state constitutional provision consistently with federal construction of a corresponding provision of the federal charter, and concludes that, on balance, we should not follow the federal approach here. (Maj. opn., ante, 101 Cal.Rptr.2d at pp. 500-503, 12 P.3d at pp. 747-750.) I am not persuaded. I shall address the four factors in order.

A.
Does the language or history of article I, section 2(a) suggest that the issue before us should be resolved differently from the way it was resolved under the First Amendment in Glickman? (Teresinski, supra, 30 Cal.3d 822, 836, 180 Cal.Rptr. 617, 640 P.2d 753.) The majority concludes that this factor weighs in favor of rejecting Glickman and finding that the marketing program challenged here implicates article I, section 2(a) of our state charter.
If we were to consider article I, section 2(a)'s words in isolation, without regard to the provision's history, and without considering the highly regulated context of the program here at issue, I might agree with the majority that the program presently challenged "implicates" article I, section 2(a). But it is not appropriate to consider the text of the state constitutional provision in isolationwe must consider it along with its history and context. In this regard, I emphasize the following:

1.
The majority asserts that "[a]s a general rule," article I, section 2(a)'s "right to freedom of speech" is "broader" and "greater" than that provided under the First Amendment, and that only in exceptional circumstances does the state provision fail to afford greater or broader free speech rights. (Maj. opn., ante, 101 Cal.Rptr.2d at pp. 486-487, 12 P.3d at pp. 734-736.) Because the proper application of the state free speech clause necessarily must be determined on a case-by-case basis, I am not convinced that it is helpful to attempt to quantify the question in terms of a "general rule." Nevertheless, on the basis of past decisions, it is incorrect to suggest that in all but exceptional circumstances the state Constitution provides greater or broader protection for speech than does the First Amendment. Instead, at least in *513 the numerous areas that have been litigated, California decisions applying the state free speech clause have more often than not concluded that the state provision affords no greater protection than that afforded by the First Amendment.
For example, recently in Los Angeles Alliance for Survival v. City of Los Angeles (2000) 22 Cal.4th 352, 93 Cal.Rptr.2d 1, 993 P.2d 334 (Los Angeles Alliance ), although emphasizing that our free speech clause is written in terms broader than the First Amendment, we held that our provision offers no greater protection of "solicitation speech," and that our state standard for determining the validity of anti-solicitation laws is the same as the federal test. (At pp. 365-379, 93 Cal.Rptr.2d 1, 993 P.2d 334.)
Similarly, for the past half-century, we have interpreted article I, section 2(a), (or its substantively identical predecessors) in numerous other contexts, as affording comparable but no greater protection for speech than that provided under the First Amendment. (See, e.g., Brown v. Kelly Broadcasting Co. (1989) 48 Cal.3d 711, 745-746, 257 Cal.Rptr. 708, 771 P.2d 406, and cases cited [applying First Amendment standards in defamation action under article I, section 2(a), and holding that the state provision does not impose greater obstacles to recovery than what is required by the First Amendment]; Leoni v. State Bar (1985) 39 Cal.3d 609, 614, fn. 2, 622-628, 217 Cal.Rptr. 423, 704 P.2d 183 [upholding under both First Amendment and article I, section 2(a), with no different analysis for the state law claim, discipline imposed for certain unsolicited and misleading attorney advertising]; Metromedia, Inc. v. City of San Diego (1980) 26 Cal.3d 848, 866-871, 164 Cal.Rptr. 510, 610 P.2d 407 [upholding under both First Amendment and article I, section 2(a), with no different analysis for the state law claim, a city's ban on off-site advertising billboards], revd. sub nom. Metromedia, Inc. v. San Diego (1981) 453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed.2d 800; Loska v. Superior Court (1986) 188 Cal.App.3d 569, 581-584, 233 Cal.Rptr. 213 [upholding under both First Amendment and article I, section 2(a), with no different analysis for the state law claim, ordinance prohibiting scalping by commercial ticket sellers on public property]; In re Mares (1946) 75 Cal.App.2d 798, 802-805, 171 P.2d 762 [upholding under both First Amendment and predecessor to article I, section 2(a), with no different analysis for the state law claim, ordinance prohibiting sidewalk solicitation of magazine subscriptions]; Pittsford v. City of Los Angeles (1942) 50 Cal. App.2d 25, 27, 29-39, 122 P.2d 535 [upholding under both First Amendment and predecessor to article I, section 2(a), with no different analysis for the state law claim, ordinance prohibiting sidewalk distribution of commercial handbills]; see also Wirta v. Alameda-Contra Costa Transit Dist. (1967) 68 Cal.2d 51, 54, 57, 64 Cal.Rptr. 430, 434 P.2d 982 [noting that "[a] long line of decisions has established the rule that commercial messages do not come within the orbit of the First Amendment," and failing to suggest any different rule under the state Constitution].)
To be sure, we have held that article I, section 2(a) protects speech activity that the First Amendment does not. (Robins v. Pruneyard Shopping Center (1979) 23 Cal.3d 899, 908-910, 153 Cal.Rptr. 854, 592 P.2d 341 [recognizing a right of free speech in privately owned large shopping center].) But in light of the numerous cases cited above, upholding various regulations under both the First Amendment and our state's free speech provision, with no different analysis for the state law claim, this hardly supports the majority's assertion that as a general rule, and absent exceptional circumstances, article I, section 2(a), provides speech protection that is broader or greater than that afforded under the First Amendment.

2.
California has had for more than 150 years the same core language in article I, *514 section 2(a)the declaration that "[e]very person may freely speak, write and publish his or her sentiments on all subjects." The majority asserts that this language affords greater protection to commercial speech than does the First Amendment.
We have not been cited to any California decision prior to 1942 (when the United States Supreme Court held there was no First Amendment protection for commercial speech in Valentine v. Chrestensen (1942) 316 U.S. 52, 54-55, 62 S.Ct. 920, 86 L.Ed. 1262), that recognized under article I, section 2(a)'s predecessors any greater protection for commercial speech than that afforded by the First Amendment. From the filing of Valentine v. Chrestensen in 1942, until 1976, when the high court reversed itself and found that commercial speech enjoys some constitutional protection, subject to police power regulation (Va, Pharmacy Bd. v. Va. Consumer Council (1976) 425 U.S. 748, 770-773, 96 S.Ct. 1817, 48 L.Ed.2d 346), our courts followed federal high court cases in upholding various commercial speech regulations. (See, e.g., In re Mares, supra, 75 Cal.App.2d 798, 802-805, 171 P.2d 762.) Likewise, since 1976 no California decision has suggested that California's protection of commercial speech is different in any respect from that provided under the First Amendment. (See, e.g., Leoni v. State Bar, supra, 39 Cal.3d 609, 614, fn. 2, & 622-628, 217 Cal.Rptr. 423, 704 P.2d 183; Metromedia, Inc. v. City of San Diego, supra, 26 Cal.3d 848, 866-871, 164 Cal. Rptr. 510, 610 P.2d 407; Loska v. Superior Court, supra, 188 Cal.App.3d 569, 581-584, 233 Cal.Rptr. 213; People v. Superior Court (Olson) (1979) 96 Cal.App.3d 181, 195, 157 Cal.Rptr. 628.) This history suggests that it would be quite suspect now to read into article I, section 2(a), an expansive protection of commercial speech that the California courts have failed to discern.[10] Again, the cases demonstrate that although our free speech clause is written in terms broader than the First Amendment, California courts nevertheless have long interpreted it as providing no greater protection for commercial speech than is afforded by the First Amendment.

3.
Finally, at least 40 other states have constitutional provisions with language that is substantively akin to that contained in the free speech provision of article I, section 2(a). (See Los Angeles Alliance, supra, 22 Cal.4th 352, 366, fn. 10, 93 Cal. Rptr.2d 1, 993 P.2d 334.) Nothing in the briefs filed in this case, or in the majority opinion, suggests that the history and treatment of the provisions in those states differs significantly from the history and treatment in ours. It appears that until the United States Supreme Court held in *515 1976 that commercial speech is entitled to some level of protection under the First Amendment, in the few instances in which a state constitutional free speech provision was advanced as a basis for challenging a law, the courts of these other jurisdictions simply followed high court decisions in upholding various state regulations of commercial speech. (E.g., Planned Parenthood Committee v. Maricopa County (1962) 92 Ariz. 231, 375 P.2d 719; State v. Lambert (1975) 68 Wis.2d 523, 229 N.W.2d 622.) Although sister state decisions since 1976 regularly contain general comments to the effect that the language of their provision is "broader" than that of the First Amendment (see cases cited in Los Angeles Alliance, supra, 22 Cal.4th 352, 366, 93 Cal.Rptr.2d 1, 993 P.2d 334), most jurisdictionslike our own (see ante, 101 Cal.Rptr.2d at pp. 481-82, 12 P.3d at pp. 730-731)have in practice interpreted their provisions as providing protection coextensive with the First Amendment. (E.g., State v. Wicklund, supra, 589 N.W.2d 793, 799 [observing that numerous other states with "virtually identical language have interpreted the free speech provisions of their constitutions as coextensive with that of the First Amendment"]; see also id., at p. 799, fn. 5 [citing cases].) With the possible exception of cases from Oregon,[11] no decision of which I am aware from these other states has held that the state protection of commercial speech is greater than that provided by the First Amendment,[12] and a number of decisions have concluded otherwise.[13] Finally, like California, numerous other states long have had substantially similar agricultural marketing programs that have included compelled funding of generic advertising (see ante, at pp. 509-510, 12 P.3d at p. 756), and in many of those jurisdictions courts have entertained and rejected diverse constitutional challenges to such programs. (E.g., C.V. Floyd Fruit Co. v. Florida Citrus Commission (1937) 128 Fla. 565, 175 So. 248;[14]State v. Enking *516 (1938) 59 Idaho 321, 82 P.2d 649; Miller v. Michigan State Apple Commission (1941) 296 Mich. 248, 296 N.W. 245;[15]Louisiana State Department of Agriculture v. Sibille (1945) 207 La. 877, 22 So.2d 202; Wickham v. Trapani (N.Y.App.Div.1966) 26 A.D.2d 216, 272 N.Y.S.2d 6; see also Swisher v. Brown (1965) 157 Colo. 378, 402 P.2d 621, 628 [noting that 21 states had upheld similar marketing acts].) Although amicus curiae participation in the present case has been extensive, no case from any of these numerous jurisdictions[16] has been brought to our attention suggesting, much less holding, that a state constitution's free speech clause provides protection for commercial speech in the context here at issue, i.e., when a person or entity (i) properly is required to associate with other business enterprises in conjunction with a regulatory scheme, and (ii) is required, in conjunction with that regulatory scheme, to help fund generic, nonpolitical, and nonideological commercial advertising that is germane to the purpose of the compelled association.[17]
This considerable history, and the absence of a holding from any other state similar to the one proposed by today's majority, suggest it would be inappropriate to now read into article I, section 2(a), rights with respect to commercial speech that numerous other courts in numerous other analogous jurisdictions previously have failed to recognize. I believe that this first Teresinski factor militates in favor of following the approach set out in Glickman.

B.
The final three Teresinski factors yield the same conclusion.
Does the federal decision in question overrule precedent or limit previously established rights under the United States Constitution? (Teresinski, supra, 30 Cal.3d 822, 836, 180 Cal.Rptr. 617, 640 P.2d 753.) As the majority recognizes, the answer is "no." (Maj. opn., ante, 101 Cal. Rptr.2d at pp. 500-501, 12 P.3d at pp. 747-748.) This factor militates in favor of following the approach set out in Glickman.
Was the decision unanimous, and has it inspired "incisive academic criticism"? (Teresinski supra, 30 Cal.3d 822, 836-837, 180 Cal.Rptr. 617, 640 P.2d 753, italics added.) Glickman was closely divided and, like many high court opinions, it has been criticized, although it may be doubted whether the academic literature reflects the kind of incisive criticism contemplated in Teresinski.[18] As the majority recognizes, *517 the result reached by Glickman also has support in the academic community. (Maj. opn., ante, 101 Cal.Rptr.2d at p. 496, 12 P.3d at p. 743-744.) On the whole, this third factor does not provide a strong basis for declining to follow the reasoning of Glickman.
The last Teresinski factor presents the question: if Glickman is followed by our courts, would it overturn established California doctrine affording greater rights under article I, section 2(a)? (Teresinski supra, 30 Cal.3d 822, 837, 180 Cal.Rptr. 617, 640 P.2d 753.) The majority again admits that the answer is "no." (Maj. opn., ante, 101 Cal.Rptr.2d at p. 500, 12 P.3d at p. 747.) As explained above, and as the majority acknowledges (id., at p. 490, fn. 6, 12 P.3d at p. 739, fn. 6), there is no California precedent to overturn, because before today's holding there simply was no decision establishing greater commercial rights under the state provision than are provided under the First Amendment. Further, although agricultural marketing programs, with their generic advertising components, have been in existence in California for many decades, no California decision has suggested that such programs pose constitutional problems under article I, section 2(a).
Accordingly, I conclude, contrary to the majority's assertion, that the four Teresinski factors militate in favor of adopting Glickman's approach in construing article I, section 2(a).

III.
As just explained, I am not convinced that we should disavow Glickman in construing our free speech provision. If we were to follow Glickman here, we would conclude that article I, section 2(a) is not implicated by the challenged marketing program.
Nevertheless, the majority holds that article I, section 2(a) is implicated by the plum marketing program. Having so concluded, however, the majority leaves for the Court of Appeal the task of attempting to resolve, on remand, whether the program actually violates the state Constitution. This issue was fairly raised in the petition for review, it is well addressed in the briefs, and the majority fails adequately to explain why this court should not also determine the standard of review and then apply that standard in order to decide whether the state free speech provision is violated here.
Gerawan proposes application of the test originally set out in Central Hudson Gas & Elec. v. Public Serv. Comm'n (1980) 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (Central Hudson ), which evaluates the validity of regulations restricting commercial speech under the following four-part approach: (i) is the expression constitutionally protected (if it is misleading or concerns illegal activity, it is not protected at all); (ii) does the regulation serve a "governmental interest" that is "substantial"; (iii) does the regulation "directly advance" such an interest; and (iv) is the regulation "not more extensive than ... necessary"? (Id., at p. 566, 100 S.Ct. 2343; see also Bolger v. Youngs Drug Products Corp. (1983) 463 U.S. 60, 68-69, 103 S.Ct. 2875, 77 L.Ed.2d 469.)[19]
*518 The majority in Glickman, supra, 521 U.S. 457, 117 S.Ct. 2130, 138 L.Ed.2d 585, stated that had it concluded that free speech rights were implicated in the case before it, the appropriate standard of review would not be that set out in Central Hudson, supra, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341, but instead the test used in Abood, supra, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261, and Keller, supra, 496 U.S. 1, 110 S.Ct. 2228, 110 L.Ed.2d 1, both of which addressed the compelled funding of speech. (Glickman, supra, 521 U.S. 457, 473 & 474, fn. 18, 117 S.Ct. 2130.)[20] In Abood and Keller the high court was forced to determine whether it is permissible to compel the funding of contributions from individuals properly required to associate, and against objections that such funding implicated political or ideological matters and hence violated core First Amendment rights of the persons compelled. The court in Keller, following the test first set out in Abood approved compelled funding for State Bar activitieseven those that implicated political or ideological mattersso long as (i) the compelled association was justified in the first place by the need to "regulat[e] the legal profession" and "improv[e] the quality of legal services," and (ii) the compelled funding from mandatory dues was for activities that were "germane to those goals"meaning that the challenged expenditures were "reasonably incurred" for those purposes. (Keller, supra, 496 U.S. 1, 13-14,110 S.Ct. 2228.)
Consistent with the majority in Glickman, I agree that if free speech rights are implicated here, the appropriate standard of review would not be the one developed to assess restrictions on commercial speech (the Central Hudson test), but instead the test used to assess compelled funding of speech (the Abood/Keller test). (Accord, Gallo Cattle Co. v. California Milk Advisory Bd. (9th Cir.1999) 185 F.3d 969, 976-977 (Gallo ); Case Note, Constitutional LawForced Advertising: Free Speech or Not Even? Glickman v. Wileman Brothers & Elliott, Inc., 521 U.S. 457, 117 S.Ct. 2130, 138 L.Ed.2d 585 (1997) (1998) 33 Land & Water L.Rev. 779, 791-795 (Forced Advertising).)
Although in its phrasing the Abood/Keller test is plainly less exacting than Central Hudson's intermediate scrutiny standard, still, as the majority in Glickman implicitly reasoned, if the Abood/Keller test is sufficient for the purposes of assessing core First Amendment interests concerning compelled funding of political or ideological speech, the same test also should be quite adequate for the task here at hand, which concerns assessing the constitutional propriety of compelled funding of mere generic commercial advertising.
Under Abood and Keller as applicable in this context, I believe that our inquiry and the conclusions we draw should be as follows:
(i) Is there a legitimate basis for the compelled association? Yes. The interest in maintaining the stability of markets for California plums justifies legislation that allows producers and handlers to establish compelled associations designed to accomplish that goal, (ii) Is the generic advertising program germane to the purposes of the marketing order here at issue? Yes. One purpose of the marketing order is to create and support a market for California plums. The advertising program clearly is germane to that purpose; the costs of the advertising program are "reasonably incurred" *519 (Keller, supra, 496 U.S. 1, 14, 110 S.Ct. 2228) to promote that goal. (See Gallo, supra, 185 F.3d 969, 976-977; Forced Advertising, supra, 33 Land & Water L.Rev. 779, 794-795.)[21]
In summary, assuming the program here at issue implicates article I, section 2(a), it is subject to review pursuant to the Abood/Keller test, and under that test the program does not violate article I, section 2(a).
Accordingly, I would affirm the unanimous judgment of the Court of Appeal, upholding the validity of the challenged marketing program under both the federal and state Constitutions.
CHIN, J., and HANLON, J.[*], concur.
NOTES
[1] Namely, "almonds, filberts (otherwise known as hazelnuts), California-grown peaches, cherries, papayas, carrots, citrus fruits, onions, Tokay grapes, pears, dates, nectarines, celery, sweet corn, limes, olives, pecans, eggs, avocadoes, apples, raisins, walnuts, tomatoes, . . . Florida grown strawberries, [and] cranberries." (7 U.S.C. 608c(6)(I).)
[2] Since 1994, motions for judgment on the pleadings have been authorized by statute. (Stats. 1993, ch. 456, § 5, pp. 2524-2527, adding Code Civ.Proc., § 438; Stats. 1994, ch. 493, § 2, amending Code Civ.Proc., § 438.) Previously, they were allowed by common law. (See Smiley v. Citibank (1995) 11 Cal.4th 138, 143, 44 Cal.Rptr.2d 441, 900 P.2d 690, affd. (1996) 517 U.S. 735, 116 S.Ct. 1730, 135 L.Ed.2d 25; see also Ott v. Alfa-Laval Agri, Inc. (1995) 31 Cal.App.4th 1439, 1447, 37 Cal.Rptr.2d 790.) Generally, as such motions were, so they remain.
[3] By our leave, numerous entities have submitted briefs as amici curiae supporting either Gerawan's position or that of the Secretary of Food and Agriculture, either in whole or in part, including the American Federation of Labor and Congress of Industrial Organizations, the California Apple Commission et al., the California Asparagus Commission et al., the California Table Grape Commission et al., the Center for Individual Freedom, Matsui Nursery, Inc., et al., the State Bar of California, the Sun-Maid Growers of California, the Washington Legal Foundation, and Wileman Bros. & Elliott, Inc. In conjunction with its brief, the State Bar of California requests us to take judicial notice of a tentative decision, which is evidently now final, in Brosterhous v. State Bar of California (Super.Ct.Sac.County, 1999, No. 95AS03901). We hereby grant the request. As a "reviewing court" (Evid.Code, § 459, subd. (a)), we may take judicial notice of the "[r]ecords of ... any court of this state" (id., § 452, subd. (d)). We do so with respect to the tentative decision, which is included therein.
[4] Excepting, perhaps, other sorts of messages about other sorts of products or services. (See Friesen, State Constitutional Law: Litigating Individual Rights, Claims and Defenses (2d ed.1996) § 5-2(b)(4), p. 274 [allowing such an exception if supported by "[h]istory in a particular state"]; see generally Troy, Advertising: Not "Low Value" Speech (1999) 16 Yale J. on Reg. 85, 87-144 [providing such "history," although largely outside of California]; see also In re Morse (1995) 11 Cal.4th 184, 200, fn. 4, 44 Cal.Rptr.2d 620, 900 P.2d 1170 [stating in dictum that "we see no reason why" an attorney's "misleading advertisements would be protected commercial speech under" article I's free speech clause].)
[5] See Hamilton, The Ancient Maxim Caveat Emptor (1931) 40 Yale L.J. 1133, 1186 (stating that, in the course of the 19th century in the United States, the "common sense of individualism won for" the doctrine of caveat emptor "judicial acceptance, fitted it out with legal trappings, and made it a vehicle of public policy"; "judges discover[ed] that [the doctrine] sharpened wits, taught self-reliance, and made a manan economic manout of the buyer").
[6] We recognize that our conclusions concerning article I's free speech clause and commercial speech, which are set out in the text, have not been anticipated completely and in their entirety in prior California judicial decisions. That is because article I's free speech clause and commercial speech were not considered on their own terms in any of these prior decisions, but only, for example, through the distorting lens of the United States Supreme Court's commercial speech/noncommercial speech dichotomy in First Amendment jurisprudence. (See, e.g., Leoni v. State Bar (1985) 39 Cal.3d 609, 614, fn. 2, & 622-628, 217 Cal.Rptr. 423, 704 P.2d 183 [dealing with commercial speech under both article I's free speech clause and the First Amendment's, but, in effect, construing and applying only the First Amendment's free speech clause and not article I's]; Metromedia, Inc. v. City of San Diego (1980) 26 Cal.3d 848, 866-871, 164 Cal.Rptr. 510, 610 P.2d 407, revd. sub nom. Metromedia, Inc. v. San Diego (1981) 453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed.2d 800 [same]; Jacoby v. State Bar, supra, 19 Cal.3d at pp. 363, fn. 2, & 366-380, 138 Cal.Rptr. 77, 562 P.2d 1326 [same]; Welton v. City of Los Angeles (1976) 18 Cal.3d 497, 503-504, 134 Cal. Rptr. 668, 556 P.2d 1119 [dealing with commercial speech solely under the First Amendment's free speech clause]; Wirta v. Alameda-Contra Costa Transit Dist. (1967) 68 Cal.2d 51, 54, 57, 64 Cal.Rptr. 430, 434 P.2d 982 [citing article Is free speech clause, but dealing with commercial speech solely under the First Amendment's]; McKay Jewelers, Inc. v. Bowron (1942) 19 Cal.2d 595, 596, 604-605, 122 P.2d 543 [dealing with commercial speech apparently under article I's free speech clause as well as under the First Amendment's]; Loska v. Superior Court (1986) 188 Cal.App.3d 569, 581-584, 233 Cal.Rptr. 213 [dealing with commercial speech under both article I's free speech clause and the First Amendment's, but, in effect, construing and applying only the First Amendment's free speech clause and not article I's]; Women's Internat. League etc. Freedom v. City of Fresno (1986) 186 Cal.App.3d 30, 33-42, 237 Cal. Rptr. 577 [dealing with political speech over against commercial speech under article I's free speech clause]; In re Mares (1946) 75 Cal.App.2d 798, 802-805, 171 P.2d 762 [dealing with commercial speech under the First Amendment's free speech clause and perhaps also under article I's]; Pittsford v. City of Los Angeles (1942) 50 Cal.App.2d 25, 27, 31-39, 122 P.2d 535 [citing article I's free speech clause, but dealing with commercial speech under the First Amendment's alone]; People v. Osborne (1936) 59 P.2d 1083, 17 Cal. App.2d Supp. 771, 778 [dealing with commercial speech under the otherwise unspecified "constitutional liberty of speech," which may refer to article I's free speech clause and perhaps also the First Amendment's].)
[7] We note in passing that the Glickman majority stated that marketing orders issued by the Secretary of Agriculture pursuant to the AMAA are "expressly exempted from the anti-trust laws." (Glickman v. Wileman Brothers & Elliott, Inc., supra, 521 U.S. at p. 461, 117 S.Ct. 2130, citing 7 U.S.C. § 608b.) Incorrectly. What are exempted, impliedly if not expressly, are not marketing orders, but rather marketing agreements. (7 U.S.C. § 608b(a).)
[8] Without contradiction by the Glickman majority, Justice Souter noted that generic advertising under Marketing Order No. 917 did not "represent so-called `government speech,' with respect to which the Government may have greater latitude in selecting content than otherwise permissible under the First Amendment...." (Glickman v. Wileman Brothers & Elliott, Inc., supra, 521 U.S. at p. 482, fn. 2, 117 S.Ct. 2130 (dis. opn. of Souter, J.).) "Government speech" is, somewhat tautologically, speech by the government itself concerning public affairs. (See Keller v. State Bar of California, supra, 496 U.S. at p. 10, 110 S.Ct. 2228; Abood v. Detroit Board of Education, supra, 431 U.S. at p. 259, fn. 13, 97 S.Ct. 1782 (cone. opn. of Powell, J.).) It does not appear to cover generic advertising under a federal marketing order, which is not so much a mechanism of regulation of the producers and handlers of an agricultural commodity by a governmental agency, as a mechanism of self-regulation by the producers and handlers themselves.
[9] Accord, Gallo Cattle Co. v. California Milk Advisory Bd. (9th Cir.1999) 185 F.3d 969, 974-975 (concluding to the effect that, so far as the Glickman majority's analysis is concerned, the CMA is not materially different from the AMAA).

In apparent contrast to both the AMAA and the CMA is the Mushroom Promotion, Research, and Consumer Information Act of 1990 (Pub.L. No. 101-624, tit. XIX, § 1921 et seq. (Nov. 28, 1990) 104 Stat. 3854 et seq., as amended, codified at 7 U.S.C. § 6101 et seq.), which has been characterized as "basically a commercial advertising statute designed to assess mushroom growers for the cost of advertising" (United Foods, Inc. v. U.S. (6th Cir. 1999) 197 F.3d 221, 222, fn. 1, cert. granted Nov. 27, 2000, 531 U.S. 1009, 121 S.Ct. 562, 148 L.Ed.2d 482.)
[10] Compare Cal-Almond Inc. v. U.S. Dept. of Agr. (9th Cir.1999) 192 F.3d 1272, 1274-1277 (concluding to the effect that, so far as the Glickman majority's analysis is concerned, the Marketing Order for Almonds Grown in California (7 C.F.R. § 981 (1999) [semble: not specifying the date of the order in question] ), which was issued under the AMAA, is not materially different from Marketing Order No. 917); Gallo Cattle Co. v. California Milk Advisory Bd., supra, 185 F.3d at pages 974-975 (concluding to similar effect as to the Marketing Order for Research, Education and Promotion of Market Milk and Dairy Products in California, which was issued under the CMA); Goetz v. Glickman (10th Cir.1998) 149 F.3d 1131, 1138-1139 (concluding to similar effect as to the Beef Promotion and Research Order (7 C.F.R. § 1260A (1998) [semble: not specifying the date of the order in question] ), which was issued under the Beef Promotion and Research Act of 1985 (Pub.L. No. 99-198, tit. XVI, § 1601 et seq. (Dec. 23, 1985) 99 Stat. 1597 et seq., as amended, codified at 7 U.S.C. § 2901 et seq.).

In apparent contrast to both Marketing Order No. 917 and the California Plum Marketing Program is the Mushroom Promotion, Research, and Consumer Information Order (7 C.F.R. § 1209 (1999) [semble: not specifying the dale of the order in question] ), which has been said to leave the "market in mushrooms" "relatively free," "[e]xcept for [a] compelled advertising program assessing growers" to cover related expenses (United Foods, Inc. v. U.S., supra, 197 F.3d at p. 223). See ante, 101 Cal.Rptr.2d at page 498, footnote 9, 12 P.3d at p. 745, footnote 9.
[11] See ante, 101 Cal.Rptr.2d at page 488, footnote 4, 12 P.3d at p. 736, footnote 4.
[12] See Werner v. Southern Cal. etc. Newspapers (1950) 35 Cal.2d 121, 124, 216 P.2d 825 stating in dictum that the "primary purpose" of article I's free speech clause is "to guarantee that freedom of speech shall not be restrained except to prevent abuse").
[13] Whether, and how, article I's free speech clause may accommodate government speech (see ante, 101 Cal.Rptr.2d at p. 495, fn. 8, 12 P.3d at p. 742, fn. 8) is a question that we need not, and do not, answer. In its amended complaint, Gerawan did not allege facts that would show that generic advertising under the California Plum Marketing Program which is not so much a mechanism of regulation of the producers and handlers of an agricultural commodity by a governmental agency, as a mechanism of self-regulation by the producers and handlers themselves amounts to speech of this sort. Neither did the Secretary of Food and Agriculture so claim in his motion for judgment on the pleadings. At oral argument, counsel for certain of the amici curiae supporting the secretary's position attempted to raise the point. Too little, too late.
[14] Because of the result that we reach, we need not, and do not, address the issue, which was raised before the superior court and the Court of Appeal, whether the California Plum Marketing Program implicates Gerawan's right to freedom of association under either the First Amendment or article I by compelling funding of generic advertising.
[1] The court further explained: "Congress enacted the Agricultural Marketing Agreement Act of 1937 (AMAA) ... in order to establish and maintain orderly marketing conditions and fair prices for agricultural commodities. [Citation.] Marketing orders promulgated pursuant to the AMAA are a species of economic regulation that has displaced competition in a number of discrete markets; they are expressly exempted from the antitrust laws. [Citation.] Collective action, rather than the aggregate consequences of independent competitive choices, characterizes these regulated markets. In order `to avoid unreasonable fluctuations in supplies and prices,' [citation], these orders may include mechanisms that provide a uniform price to all producers in a particular market, that limit the quality and the quantity of the commodity that may be marketed, [citation], that determine the grade and size of the commodity, [citation], and that make an orderly disposition of any surplus that might depress market prices [citation]. Pursuant to the policy of collective, rather than competitive, marketing, the orders also authorize joint research and development projects, inspection procedures that ensure uniform quality, and even certain standardized packaging requirements. [Citation.] The expenses of administering such orders, including specific projects undertaken to serve the economic interests of the cooperating producers, are `paid from funds collected pursuant to the marketing order.' [Citation.] [¶] Marketing orders must be approved by either two-thirds of the affected producers or by producers who market at least two-thirds of the volume of the commodity. [Citation.] The AMAA restricts the marketing orders `to the smallest regional production areas . . . practicable.' [Citation.] The orders are implemented by committees composed of producers and handlers of the regulated commodity, appointed by the Secretary, who recommend rules to the Secretary governing marketing matters such as fruit size and maturity levels. [Citation.] The committees also determine the annual rate of assessments to cover the expenses of administration, inspection services, research, and advertising and promotion. [Citation.] [¶] Among the collective activities that Congress authorized for certain specific commodities is `any form of marketing promotion including paid advertising.' [Citation.] The authorized promotional activities, like the marketing orders themselves, are intended to serve the producers' common interest in disposing of their output on favorable terms. The central message of the generic advertising at issue in this case is that `California Summer Fruits' are wholesome, delicious, and attractive to discerning shoppers. [Citation.] All of the relevant advertising, insofar as it is authorized by the statute and the Secretary's regulations, is designed to serve the producers' and handlers' common interest in promoting the sale of a particular product." (Glickman, supra, 521 U.S. 457, 461-462, 117 S.Ct. 2130, fns. omitted.)
[2] At this point, the court explained in Glickman: "We considered, in Abood [, supra, 431 U.S. 209, 97 S.Ct. 1782], whether it was constitutional for the State of Michigan to require government employees who objected to unions or union activities to contribute to an 'agency shop' arrangement requiring all employees to pay union dues as a condition of employment. We held that compelled contributions to support activities related to collective bargaining were `constitutionally justified by the legislative assessment of the important contribution of the union shop' to labor relations. Id., at 222 [97 S.Ct. 1782]. Relying on our compelled-speech cases, however, the Court found that compelled contributions for political purposes unrelated to collective bargaining implicated First Amendment interests because they interfere with the values lying at the `heart of the First Amendment [] the notion that an individual should be free to believe as he will, and that in a free society one's beliefs should be shaped by his mind and his conscience rather than coerced by the State.' Id., at 234-235 [97 S.Ct. 1782]; see also id., at 235 [97 S.Ct. 1782]." (Glickman, supra, 521 U.S. 457, 471-472, 117 S.Ct. 2130.)
[3] Phrased affirmatively, Keller stands for the proposition that assessments to fund a lawful collective program may be used to pay for speech over the objection of association members so long as the speecheven if ideological or politicalis germane to the purposes for which the compelled association is justified.
[4] Even if I concluded otherwise on the merits, I could not endorse the tone of the majority's criticism of the United States Supreme Court in Glickman.
[5] Other states subsequently enacted, or revised and reenacted, similar legislation. (See, e.g., 1955 Wash.Laws, ch. 191, §§ 1-29; 1961 Pa.Laws, No. 657, §§ 1-14; 1967 N.D. Laws, ch. 75, §§ 1-17; 1969 Ohio Laws H. No. 576; 1971 NJ. Laws, ch. 308, §§ 1-34; 1971 Iowa Acts, ch. 143, §§ 1-34.)
[6] The assessments under the California Plum Marketing Programlike the assessments that have been imposed by other statesare calculated based upon weight of produce marketed. Currently, the assessment is set at a rate not to exceed 20 cents per 28 pound box of fruit. That sum is earmarked as follows: 2 cents for research, 7 cents for quality standards and inspections, and 11 cents for generic advertising, sales promotion, and market development.
[7] Akin to the antitrust immunity conferred under the federal programs (see maj. opn., ante, 101 Cal.Rptr.2d at p. 492, fn. 7, 12 P.3d at p. 740, fn. 7), California law expressly grants these producers and handlers a defense to any action alleging violation of state antitrust, unfair practices, unfair trade, or monopoly laws. (Food & Agr.Code, § 58655.)
[8] The impetus for the CMA is well described in Voss v. Superior Court (1996) 46 Cal. App.4th 900, 907-908, 54 Cal.Rptr.2d 225: "The CMA constitutes a legislative entrustment of the power to regulate the marketing of agricultural commodities to those who produce or otherwise deal with such products, subject to the approval of the secretary. (Shimomura, A New Look at the California Marketing Act of 1937 (1972) 5 U.C. Davis L.Rev. 190, 198.) It grew out of the chaotic conditions which characterized California agriculture during the early part of the twentieth century. (Id. at pp. 196-198.) Before the promulgation of the CMA, each of California's many fruit and vegetable growers attempted to be the first in the market with his or her commodity, in order to take advantage of the premium prices paid on early shipments. This led to the marketing of inadequately ripened produce, and the glutting of the market during the peak season with poor quality commodities. Deceptive packaging, improper sampling, and false grading were often resorted to in order to attempt to enhance the attractiveness of the produce. This `unregulated scramble' had an `adverse effect upon consumer acceptance of California fruits and vegetables,' and the unstable and fluctuating markets `had an exaggerated impact on the livelihood of the state's agricultural producers. (Id. at pp. 196-197.) The depression of 1929-1933 only exacerbated these problems; the prices paid to growers `plummeted.' (Id. at p. 198.)"
[9] The Legislature has described the purpose of the CMA consistent with these findings and observations. The Act is designed to: "(a) Enable [the] producers of this state ... to correlate more effectively the marketing of their commodities with market demands for those commodities. [¶] (b) Establish orderly marketing of commodities. [¶] (c) Provide for uniform grading and proper preparation of commodities for market. [¶] (d) Provide methods and means for the maintenance of present markets, or for the development of new or larger markets, for commodities that are grown within this state or for the prevention, modification, or elimination of trade barriers that obstruct the free flow of those commodities to market. [¶] (e) Eliminate or reduce economic waste in the marketing of commodities. [¶] (f) Restore and maintain adequate purchasing power for the producers of this state. [¶] (g) Inform the general public of the processes of producing agricultural commodities. [And] [¶] (h) Foster cooperation and understanding between urban and rural sectors of society." (Food & Agr.Code, § 58654.)
[10] I am unpersuaded by the majority's attempts to invoke secondary historical sources as support for the conclusion that the drafters of California's 1849 and 1879 Constitutions, and the drafters of a later revision and a later amendment to the free speech provision, had in mind the need to "protect[] commercial speech, at least in the form of truthful and nonmisleading messages about lawful products and services." (Maj. opn., ante, 101 Cal. Rptr.2d at p. 488, 12 P.3d at p. 736-737.) The majority does not point to any direct evidence (in the constitutional debates, revision records, or amendment materials, or otherwise) to support its hypothesis (see maj. opn., ante, at pp. 488-490, 12 P.3d at pp. 736-739), and it ignores the circumstance that the California drafters did not fashion a new free speech provision that fit the majority's description of the distinctive culture of mid 19th century California, but instead simply adopted the preexisting language of the corresponding New York Constitution. I also note that the Minnesota Supreme Court in State v. Wicklund (Minn. 1999) 589 N.W.2d 793, recently conducted a similar historical review of its substantively identical provision (id., at pp. 798-799) and found "nothing from either the 1857 [D]ebates [and Proceedings of the Constitutional Convention for the Territory of Minnesota] or decisions of other states having similar or identical provisions to suggest that our state's free speech protection was intended to be applied more broadly than its federal counterpart." That court concluded, "[T]here is nothing inherent in the language of [the state provision] which requires more expansive protection for free speech than does the First Amendment." (At p. 799.)
[11] Gerawan Farming, Inc. relies upon Moser v. Frohnmayer (1993) 315 Or. 372, 845 P.2d 1284, for the proposition that the Oregon free speech clause applies equally to commercial and noncommercial speech. Moser invalidated a law that banned commercial automated telemarketing but permitted charitable or political automated telemarketing, under Oregon's free speech clause (id., at p. 1288), which is substantively similar to article I, section 2(a). Although I do not find any explicit holding in Moser that the Oregon free speech clause applies equally to commercial and noncommercial speech, Gerawan's interpretation of Moser is arguably supported by prior Oregon appellate court cases asserting that Oregon's free speech provision generally does afford protection for commercial speech greater than that provided by the First Amendment, and indeed that commercial speech is entitled to the same protection as noncommercial speech (Ackerley Communications, Inc. v. Mult. Co. (1985) 72 Or.App. 617, 696 P.2d 1140 [invalidating billboard regulation]; City of Hillsboro v. Purcell (1987) 87 Or.App. 649, 743 P.2d 1119 [invalidating door-to-door commercial solicitation regulation]).
[12] Gerawan suggests that post 1976 opinions from Pennsylvania (which has a provision substantively similar to article I, section 2(a)) support its position that our provision protects the precise kind of commercial speech here at issue. Com. v. Bd. of Physical Therapy (1999) 556 Pa. 268, 728 A.2d 340, 343-344, upheld a regulation of advertising by chiropractors; Insurance Adj. Bureau v. Ins. Com'r (1988) 518 Pa. 210, 542 A.2d 1317, 1324, invalidated a prohibition on solicitation of insurance adjusting business within 24 hours of a disaster or fire. I do not read these cases as supporting an assertion that Pennsylvania's clause provides broader protection for commercial speech than does the First Amendment, and I do not believe they support Gerawan's assertion that our own provision protects the kind of commercial speech here at issue.
[13] E.g., State, Tp. of Pennsauken v. Schad (1999) 160 N.J. 156, 733 A.2d 1159, 1168-1170; State v. Wicklund, supra, 589 N.W.2d 793, 800-801, and cases cited; see also Nat. Fed. of Retired Persons v. Ins. Com'r (1992) 120 Wash.2d 101, 838 P.2d 680, 689; Florida Canners Ass'n v. State, Dept. of Citrus (Fla. Dist.Ct.App.1979) 371 So.2d 503, 517-519, affirmed by Coca-Cola Co., Food Division v. State, Dept. (Fla. 1982) 406 So.2d 1079, 1087-1088 (without mentioning state charter provision).
[14] See also Conner v. Joe Hatton, Inc. (Fla. 1968) 216 So.2d 209 and State, Department of Citrus v. Griffin (Fla. 1970) 239 So.2d 577 (both rejecting constitutional challenges to compelled funding and advertising programs).
[15] See also Dukesherer Farms, Inc. v. Ball (1979) 405 Mich. 1, 273 N.W.2d 877 (rejecting constitutional challenges to compelled funding and advertising program).
[16] Including Oregon (see ante, fn. 11), which, like many other states, long has had legislation similar to that presently under review. (See Or.Rev.Stats., §§ 578.010-578.990 [Oregon Wheat Commission], 579.010-579.990 [Oregon Potato Commission].)
[17] Perhaps the closest case on point is Florida Canners Ass'n v. State, Dept. of Citrus, supra, 371 So.2d 503, in which the court rejected a free speech challengebased upon both the First Amendment and its Florida constitutional counterpartto a regulation requiring citrus producers to affix a declaration (the word "Florida" or the "Florida Sunshine Tree registered certification mark") on fruit labels, or on the ends of fruit containers. (At pp. 517-519 [employing same analysis under both charters in upholding the regulation].)
[18] The majority does not assert that the student works that it cites reflect the requisite "incisive criticism" contemplated by Teresinski, but instead focuses upon three professional articles. The first two of these materials do not offer incisive criticism. Volume 2 of Smolla and Nimmer, Freedom of Speech (1999), much like some of the cited student works, contains primarily a detailed description of the various Glickman opinions (at § 20:45, pp. 20-106 to 20-114), after which the authors announce, in conclusory fashion and with no independent analysis, that Justice Souter's dissent presented the better argument. (At pp. 20-114.) Fried, Perfect Freedom, Perfect Justice (1998) 78 B.U.L.Rev. 717, is even less substantive. There, at the conclusion of a wide-ranging published lecture on jurisprudential attempts to attain "perfect freedom" and "perfect justice," the author does little more than mention, in a five-line footnote that contains no independent analysis, his disagreement with the majority in Glickman and agreement with Justice Souter's dissent. (At p. 743, fn. 84.) The third professional work relied upon by the majority, Casarez, Don't Tell Me What to Say: Compelled Commercial Speech and the First Amendment (1998) 63 Mo.L.Rev. 929 (Casarez), does indeed present a thoughtful critique of the "contextual" approach of the majority in Glickman (at pp. 960-965), but these five pages of this one work hardly constitute the kind of incisive academic criticism contemplated by Teresinski.
[19] The principal dissenting opinion in Glickman would have applied this Central Hudson standard and found that the marketing order in that case failed that test. (Glickman, supra, 521 U.S. at pp. 491-504, 117 S.Ct. 2130 (dis. opn. of Souter, J.); cf. U.S. v. Frame (3rd. Cir.1989) 885 F.2d 1119, 1133-1137 [upholding different federal marketing order under Central Hudson standard].) Justice Thomas alone would have endorsed a yet "higher standard ... applied to all speech, whether commercial or not." (Glickman, supra, 521 U.S. at p. 504, 117 S.Ct. 2130 (dis. opn. of Thomas, J.).) This aspect of Justice Thomas's dissent has been construed as calling for strict scrutiny review. (Casarez, supra, 63 Mo. L.Rev. 929, 959.)
[20] In this regard (and contrary to the suggestions of various amici curiae on behalf of Gerawan), the majority in Glickman implicitly rejected the applicability of strict scrutiny analysis in the situation before the high court.
[21] In Gallo, the Ninth Circuit Court of Appeals assumed, without deciding, that the complaining partya milk and cheese producerraised a valid ideological objection to the "Real California Cheese®" advertising campaign there at issue. (Gallo, supra, 185 F.3d 969, 976.) The court in Gallo proceeded, pursuant to Glickman, to apply the Abood/Keller test, and to uphold the program. The court reasoned: "Compelled association of the milk producers of California is justified by purposes set out in the California Marketing Act and the Marketing Order: to prevent economic waste in the marketing of commodities; to develop more efficient and equitable methods of marketing commodities; and to maintain present markets for, as well as to develop new and larger markets for, commodities grown within the State. [Citation.] The Marketing Order itself specifically provides that the authorized promotional activities are intended to maintain the present market for, as well as create new or larger markets for, California milk and dairy products. [Citations.] The CMAB's [California Milk Advisory Board's] employment of a generic advertising campaign of California Milk and dairy products, including the generic advertisement of Real California Cheese®, is obviously `germane' to these purposes." (Gallo, supra, 185 F.3d at p. 976.) The court further explained in Gallo: "Because the Real California Cheese® advertising campaign is designed to increase the overall consumption of California raw milk by increasing the demand for cheese made from California milk, it is `germane' to the Marketing Act's and Marketing Order's goals of maintaining the present market for, as well as creating new or larger markets for, California milk and dairy products. [Citations.] CMAB can therefore use Gallo's assessments, over Gallo's objection, to fund the generic advertisement of Real California Cheese®." (Id., at p. 977, registered marks in original.)
[*] Presiding Justice of the Court of Appeal, First Appellate District, assigned by the Chief Justice pursuant to article VI, section 6, of the California Constitution.